## Bellows Falls Village Corp. v. State Highway Board

[190 A.2d 695]

March Term, 1963

Present: Hulburd, C. J., Holden, Shangraw, Barney and Smith, JJ.

Opinion Filed April 9, 1963

*Albert T. Bolles* and *A. Luke Crispe* for the plaintiff.

*Keith E. King* for the defendant.

**Holden, J.** This appeal comes to us before final judgment according to 12 V.S.A. §2386. Its purpose is to obtain a review of the action of the Windham County Court in setting aside a highway condemnation award to the plaintiff in the amount of $114,000, and ordering a new trial. The Bellows Falls Village Corporation is the appellant and challenges the authority of the trial court to investigate the propriety of the jury's verdict.

The verdict was returned on Friday, May 18, 1962. Sometime during the weekend that ensued it came to the attention of a member of the court that one of the jurors had taken a private view of the premises that were the subject of the condemnation proceedings, during a recess of court at the time of the trial. It was also made known to the court that the jury had access to a newspaper clipping containing an editorial that appeared in the Bellows Falls Times on May 3, 1963 entitled "Matter of Morality." The source from which this information was communicated to the trial court does not appear in the record.

The editorial comment is a bitter denunciation of the attitude of the State Highway Board in Interstate Highway Project 91. It contains these excerpts.

"No one can predict what a jury will do once it is given a case to decide, but there are grounds for guarded optimism in the general attitude of jurors in the current session of county court toward people whose lands have been taken for Interstate Highway 91."

"The Village of Bellows Falls is vitally interested, as its own complaint against the State of Vermont is scheduled to be heard May 14. The state, it will be remembered, has offered only $23,500 for village watershed and water storage land taken even

though the state's own experts agreed replacement costs would be $117,000."

"What sticks in our craw is not only the cash costs to Bellows Falls taxpayers, although that is bad enough, but the cynical immorality of the State's welshing on its given word.

"In the business world a verbal agreement is just as binding as a written one. The entire economy of the nation is based on the assumption that people and businesses will keep their words."

"The village hired an engineering firm to ascertain the cost. It was put at $117,000. State-employed engineers said the figure was reasonable—and the state came up with its puny offer of $23,500.

"Village residents can only hope that the jury which hears the appeal will judge the case not only as a dollars and cents injustice to Bellows Falls, but as a matter of morality. If they do, then we need have no fear of the outcome."

On the following Monday, May 21st, the court summoned the jurors who had heard the case to the jury box, and in the presence of the court reporter who recorded the proceedings, inquired of each of the jurors individually concerning the events constituting the alleged misconduct. Counsel for the defendant was not available for this inquiry and counsel for the plaintiff were specifically excluded from the courtroom.

The transcript of the inquiry of the court confirmed that one of the jurors took a private view of the premises in controversy and this was the subject of comment during the deliberation of the cause. It further appears that eight of the jurors either read the editorial, or heard it discussed during the trial or at the time of their deliberations.

The court probed deeper than this. It went on to inquire of the jurors how they arrived at their verdict. In this line of inquiry, the jurors disclaimed that the private view of their fellow juror and the presence of the newspaper editorial influenced the verdict.

After the court's inquiry was completed, counsel for each of the parties were furnished a copy of the transcript of the proceedings. Acting on the facts disclosed in this record, the defendant moved to set the verdict aside. After a hearing on the merits of the motion, with extended arguments presented by both sides of this controversy, the defendant's motion was granted and the verdict set aside.

At the time of oral argument of this appeal, counsel for the plaintiff recognized and conceded that the private view taken by one of the jurors and the use of the newspaper editorial, if established from sources other than the testimony of the jurors, would justify invalidating the verdict. But the plaintiff contends that since the court acted exclusively on the disclosure made by the jurors themselves, the protection which the law affords the participation of the jury enjoined the jurors from revealing their conduct. We are asked to reinstate the verdict for the reason that the order which set it aside was erroneously predicated on the privileged communication of the delinquent jurors.

The salient point of this appeal is the contest between conflicting policies of the law. The general rule of law designed to insure freedom of deliberation in the jury room competes against the paramount need of preserving the integrity of trial by jury.

■ Since Lord Mansfield's time, the rule has prevailed that the testimony of a juror is not available to impeach a verdict in which he participated. *Vaise* v. *Delaval,* (1785) 1 T. R. 11; 8 Wigmore, Evidence, §2353 pp. 682 *et seq.* In this jurisdiction the doctrine was first applied to exclude evidence of improper deliberations of the jury after the cause was submitted. Judge Tyler explained the reason.

"It would be of dangerous tendency to admit Jurors by affidavit to detail these deliberations of the jury room, to testify to subjects not perfectly comprehended at the time, or but imperfectly recollected.

"From a natural commiseration for the losing party, or a desire to apologize for the discharge of an ungrateful duty, after the Juror had been discharged from office, he would be too apt to intimate, that if some part of the testimony had been adverted to, or something not in evidence omitted, his opinion would have been otherwise, whilst others of the panel, with different impressions or different recollections, might testify favourably for the prevailing party. This would open a novel and alarming source of litigation, and it would be difficult to say when a suit was terminated." *Robbins* v. *Windover,* 2 Tyler 11, 14.

The doctrine has been invoked in varied cases before this Court since the decision in *Robbins* v. *Windover. Harris* v. *Huntington,*

2 Tyler 129, 147; *Newton* v. *Booth,* 13 Vt. 320, 327; *Downer* v. *Baxter,* 30 Vt. 467, 474; *Sheldon* v. *Perkins,* 37 Vt. 550, 557; *Tarbell* v. *Tarbell,* 60 Vt. 486, 494, 15 Atl. 104; *Willey* v. *Carpenter,* 65 Vt. 168, 177, 26 Atl. 488; *Baker & Sons* v. *Sherman,* 71 Vt. 439, 457, 46 Atl. 57; *Marcy* v. *Parker,* 78 Vt. 73, 88, 62 Atl. 19; *Dailey* v. *Bond,* 94 Vt. 303, 305, 111 Atl. 394; *Hopkinson, Admx.* v. *Stocker,* 116 Vt. 98, 102, 70 A.2d 587. In the Hopkinson case the rule is referred to in broad language. "It has long been settled in this State that the affidavits of jurors will not be received to show any impropriety in the conduct of the jury, or improper mode of arriving at the verdict in order to set it aside."

But the cases cited in the opinion, as well as the question then in issue, are not concerned with external misconduct of the individual jurors, nor with outside influence that is exerted on the jury in the course of its deliberations. They deal with efforts by the losing litigant to establish that the jury misconceived the law or the facts in reaching a verdict.

The expressions of the jurors, their arguments and motives, their fears and hopes, the individual juryman's state of mind are communicated with confidence that they will be kept secret beyond the jury room. The preservation of this confidence is vital to the constitutional function of the jury system, and is entitled to cautious protection.

However worthy its motives, when the trial court delved into the mental processes of the jurors in this case, to search out how their verdict was composed, the protection was invaded. In this aspect of its investigation, the court exceeded the limits of its authority.

■ However, there is another facet to the judges' examination that is not implicated in the thoughts or utterances of the jurymen as they set about to reach a verdict. Independent acts of misconduct were established. Such misbehavior, even though it may have been the subject of comment among the jurors, is not entitled to the privileged secrecy of the jury room. The law will shield honest misunderstanding without protecting intentional wrongdoing. *Clark* v. *United States,* 289 U. S. 1, 53 S. Ct. 465, 77 L.Ed 993, 999, (Cardozo, J.).

The private view of one of the jurors was done against the provision of his oath that he would "well and truly try each and every issue, . . . . agreeably to the evidence given (the jury) . . . . in court and the laws of this state, . . . ." The reading of the biased advocacy of the press transgressed the obligation, "nor will you suffer any one to speak to you about the same but in court." 12 V.S.A. §5803.

Neither of these acts form any part of the jury's deliberations. Neither were done in confidence. Both are sufficient to invalidate a verdict that otherwise might have been invulnerable, without abandoning the legitimate protection of traditional privilege. *Woodward* v. *Leavitt,* 107 Mass. 453, 471, (Gray, J.) ; *Mattox* v. *United States,* 146 U. S. 140, 13 S. Ct. 52, 36 L. Ed. 917, 920 (Fuller, C. J.,) ; *State* v. *Kociolek,* 20 N. J. 92, 118 A.2d 812, 815, 58 A.L.R. 2d 545, (Brennan, J.) ; *Driscoll* v. *Gatcomb,* 112 Me. 289, 92 A.2d 39 L.R.A. 1915B 702; *Capozzi* v. *Butterwei,* 2 N. J. Super. 595, 65 A.2d 144, 145; 8 Wigmore, Evidence §2354 (3d Ed., also McNaughton Ed. 1961) ; 39 Am. Jur. New Trial §§79, 86; 66 C.J.S. New Trial §§52, 54.

To be sure, the corrective procedure must be cautiously administered. And it should be resorted to only where there has been a convincing demonstration of prejudicial wrongdoing, "sufficient to satisfy the judge that the light should be let in." See *Clark* v. *United States, supra,* 77 L. Ed. at 1000. Once the requirement is satisfied, counsel should be allowed to attend whatever further inquiry is indicated.

We must assume, in support of the ruling below, that the members of the Windham County Court became aware of some compelling fact or circumstance which motivated them to affirmative action. While we do not sanction the procedure adopted, in conducting the inquiry in the absence of counsel, the record of what transpired was made available, with full hearing afforded to both litigants.

The court's conscientious efforts in this direction were vindicated by the candid disclosure of the jurors that objective events, exerting an outside influence, had been brought to bear on their verdict. Despite the inadmissible affirmations of the jury that their mental processes were not affected, the verdict is suspect. At best,

it is a doubtful instrument for settling the substantial rights that are at stake.

■ In such circumstances, the test is not whether the irregularity actually influenced the result, but whether it had the capability of prejudicing the verdict. *Panko* v. *Flintkote Co.*, 7 N. J. 55, 80 A.2d 302, 306. Indeed, the human mind often may be unaware of what factors influenced its judgment in a given situation.

We think the trial court was rightly persuaded that it was better that the parties suffer the delay and expense which will attend a new trial, rather than permit a mistrusted and pernicious result to dominate the controversy. *Hopkinson's Admx.* v. *Stocker, supra,* 116 Vt. at 103. In this there was no abuse of discretion.

*Order setting aside the verdict and directing a new trial affirmed. Cause remanded.*