# State of Vermont v. Samuel L. Hudson

[658 A.2d 531]

No. 92-628

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed February 17, 1995

*Jeffrey L. Amestoy*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*David H. Casier*, Burlington, for Defendant-Appellant.

**Johnson, J.** Defendant was convicted by jury of first-degree murder based on the shooting death of a man during an attempted robbery in which defendant participated. On appeal, he argues that several of the court's instructions to the jury were erroneous, and that the court should have granted his motion for a new trial based upon jury misconduct. He also argues that the evidence was insufficient to support his conviction. We affirm.

## I.

The following are the facts, viewed most favorably to the State and excluding modifying evidence. See *State v. Elkins*, 155 Vt. 9, 17, 580 A.2d 1200, 1204 (1990) (citing standard for reviewing denial of motion for judgment of acquittal). Early on the morning of June 4, 1991, William Bessette was shot and killed outside the home of Ann Barbour in Essex Junction, Vermont. The previous afternoon, defendant, David Shelby, Timothy Roarda, and Ronald McGee, who is defendant's brother-in-law, gathered at defendant's home. McGee felt that William Bessette, Ann Barbour's "enforcer," posed a threat to McGee's brother, Leroy, because of a disagreement between Ann and Leroy over a drug debt. Defendant armed himself with a rifle, and the four men drove first to Leroy's place of work to talk to him, and then to Barbour's house.

At some point during the drive, the group devised a plan to steal cocaine from Barbour's house. According to the plan, McGee would enter Barbour's home while Shelby and defendant waited outside. When McGee gave the signal, Shelby and defendant would enter the house. Defendant and McGee would hold the occupants of the home at gunpoint, while Shelby retrieved the drugs. Roarda would serve as lookout and driver of the getaway car.

The group arrived at Barbour's house as planned to steal the cocaine. McGee, armed with a concealed handgun, knocked at the door and entered the residence. Defendant, who was carrying his rifle, waited by the side of the house, while Roarda remained near the car. Inside the home, McGee encountered Barbour, Bessette, and three other men. Eventually, he went down to the basement, where he used cocaine. Shelby grew impatient with the delay and knocked at the door. After being scrutinized by the occupants of the house, Shelby went downstairs and used cocaine. At one point, McGee rejected Shelby's suggestion that they abandon the robbery.

Shortly thereafter, McGee, Shelby, Bessette and another person left Barbour's house and were met by defendant, who pointed his rifle at Bessette. Bessette grabbed the barrel of the gun and struggled with defendant. McGee then shot Bessette in the back of the head, killing him. While the others ran off, McGee reentered the house and tried to get the two men remaining there to go outside. Apparently unaware that Bessette had been shot, they declined. A few minutes later, when defendant, Shelby, and Roarda picked McGee up, McGee told them that he had returned to the house in an unsuccessful attempt to get the cocaine. McGee wanted to go back again but Roarda refused to stop the car.

## II.

Defendant challenges several of the court's jury instructions. The State argues that the defendant failed to preserve any of the claimed shortcomings in the instructions because he did not make a succinct recitation of the specific itemized objections following the instruction, as required by V.R.Cr.P. 30; *State v. Pelican*, 160 Vt. 536, 538, 632 A.2d 24, 25-26 (1993). We need not address this issue because we find no error in any of the court's instructions that differed from those requested by defendant.

### A.

Defendant objects to the court's instruction on accomplice liability, but fails to indicate what language in the instruction is objectionable. Rather, he contends that the instruction (1) allowed the jury to convict him as an accomplice based on his mere presence at the scene of the crime, and (2) relieved the State of its burden to prove that he intended to commit the underlying crime. The court gave the following instructions related to accomplice liability:

> A Defendant is liable for the acts of his accomplice when several persons combine under a common understanding, and with a common purpose, to do an illegal act. Each of these persons is criminally responsible for the acts of the others, and all who participate in the execution of the unlawful design. The Prosecution must only prove that one of the participants in the illegal project committed the homicide during the attempt to carry out that project. And remember, the project that is alleged is robbery or attempted robbery. The Defendant is liable for the acts of an accomplice, even if the accomplice somewhat departs from the plans which they had previously made, so long as the accomplice's act was incidental to execution and a natural and foreseeable consequence of the original plan and in furtherance of the plan's goal.
>
> . . . .
>
> In considering whether the critical acts were committed during the perpetration or attempted perpetration of a robbery, keep several things in mind. First, was there a plan to rob? Second, did the participants, *and specifically this Defendant*, go beyond mere planning and commence an

attempt to rob? Third, did this Defendant effectively withdraw from such an attempt? Of course, each of these questions must be answered positively before you proceed to the next.

(Emphasis added.)

The instruction plainly required more than defendant's mere presence at the scene of the crime to find him liable as an accomplice. Further, the court's use of the terms "common understanding" and "common purpose" precluded the jury from finding defendant liable as an accomplice without determining that he intended to commit the underlying crime. See *State v. Bushey*, 137 Vt. 155, 159, 400 A.2d 993, 996 (1979) (expressions "common understanding" and "common purpose" sufficiently indicate necessary concurrence of intent, purpose and object of activity to inform jury that element of intent must be common to all accomplices).

### B.

Defendant also argues that (1) the court's instruction on malice allowed the jury to convict him based solely on his intent to commit the underlying robbery, and (2) the court should have instructed the jury that the State must prove defendant intended to kill Bessette. The court gave the following instruction regarding malice.

> The accusation in this case is first degree murder. In order to prove that charge, the State must satisfy you beyond a reasonable doubt of four things: . . . three, the killing was the product of malice *and Mr. Hudson had malice.*

> . . . .

> . . . Again, an accusation of murder must be accompanied by proof beyond a reasonable doubt of malice. Malice is an intention to kill, an intention to do great bodily harm, or a wanton disregard of the likelihood that one's behavior may naturally cause death or cause great bodily harm. To find malice, a jury may take into consideration the nature of the illegal activity and the facts and circumstances surrounding the killing and the commission of those illegal acts.

> Malice may be indicated from evidence presented that the Defendant intentionally set in motion a chain of events likely to cause death or great bodily injury, or that Defendant acted with extreme indifference to the value of human life.

*However, a jury may not find malice merely from an intent
to commit the underlying felony.*

(Emphasis added.)

■ Regarding defendant's first argument, the court explicitly informed the jury that it could not conclude that defendant harbored the requisite intent for murder based merely on its conclusion that defendant intended to commit the underlying felony.

As for defendant's second argument, we note that, in its accomplice-liability instruction, the court roughly paraphrased language set forth in *State v. Orlandi,* 106 Vt. 165, 171-72, 170 A. 908, 910-11 (1934), that we disavowed in another case issued today. See *State v. Bacon,* 163 Vt. 279, 288-90, 658 A.2d 54, 61-62 (1995) (overruling dicta in *Orlandi* stating that accomplices are criminally liable "for everything done by any one of them which follows incidentally in the execution of the design as one of its natural consequences"). Unlike the trial court in *Bacon,* however, the court in this case explicitly informed the jury that the State had to prove that defendant himself, not just the triggerman, possessed the requisite intent regarding the murder of Bessette — at minimum, a wanton disregard for the likelihood that his behavior would result in death or great bodily harm. This is a correct statement of the law regarding the intent that the State was required to prove. See *Bacon,* 163 Vt. at 291, 658 A.2d at 63 (in felony murder case, State must show accomplice had intent to kill, intent to do great bodily harm, or wanton disregard that death or great bodily harm would result). Further, in paraphrasing the overruled *Orlandi* dicta, the court required that the accomplice's act be "incidental to execution *and* a natural and foreseeable consequence of the original plan *and* in furtherance of the plan's goal." Thus, the jury was required to find that the murder was a direct result of the execution of the common plan. For these reasons, the court's use of this language was not reversible error, if error at all.

■ Defendant suggests, for the first time on appeal, that the application of the "wanton disregard" standard failed to distinguish the criminal negligence standard that applies to involuntary manslaughter. Defendant makes this argument on appeal, even though his own proposed murder instruction required the State to show, at minimum, "wanton disregard" on the part of defendant. In *State v. Brunell,* 159 Vt. 1, 7–8, 615 A.2d 127, 130–31 (1992), we noted that the "wanton disregard" standard, as it applies to "depraved-heart" murder, requires that the defendant be subjectively aware of an

extreme risk to human life; on the other hand, the criminal negligence standard that applies to involuntary manslaughter does not require the State to prove that the defendant was aware of a somewhat lesser risk to human life. Here, we find no plain error because, read as a whole, the instructions fairly apprised the jury that defendant had to be aware of the great risk involved. Cf. *id.* at 8, 615 A.2d at 131 (reasonable juror would have understood "wanton disregard" instruction to mean that one must actually appreciate risk to human life in order to disregard it).

## C.

Defendant's other challenges to the court's charge are without merit. Defendant contends that the court erred by failing to instruct the jury that malice may be negated in a case of sudden passion. Because an instruction on sudden passion was neither requested nor consistent with the defense theory of the case, there is no reversible error, if any error at all. See *State v. Joy*, 149 Vt. 607, 610, 549 A.2d 1033, 1035 (1988) (while trial court must tailor its instructions to elements of offense charged and defenses raised, court need not charge on theory unsupported by law or evidence); cf. *State v. Wright*, 154 Vt. 512, 518, 581 A.2d 720, 724 (1989) (erroneous jury instructions were harmless in light of posture of defense).

■ Defendant also challenges the court's instruction on attempt, arguing that it could have led the jury to conclude that a mere first step toward commission of the robbery would be sufficient to constitute the crime of attempted robbery. This claim of error is unfounded. The court instructed the jury that the robbery must have gone "beyond mere planning," and that defendant had to have taken "some substantial step" to accomplish the illegal act. Further, the court gave a lengthy instruction on withdrawal from a criminal enterprise.

■ Next, defendant contends that the court's instruction on the underlying offense of robbery was flawed because it failed to identify the intended victim of the crime. He points out that there was evidence that Bessette's gun was taken after the murder, and argues that, without a clear identification of the robbery victims, the jury may have concluded that the theft of the gun was a sufficient predicate upon which to convict defendant for felony murder. Again, defendant's claim is unfounded. The court's charge and the parties' opening and closing statements leave no doubt that the underlying

crime in the case, upon which the felony murder charge was based, was the attempted robbery of cocaine from the occupants of Ann Barbour's home.

■ Finally, defendant claims that the court's instructions failed to inform the jury that Bessette's death must have occurred during the attempted robbery. We find no error in the instructions, which required the jury to find that "the killing was done in the perpetration or attempted perpetration of a robbery," and that the homicide occurred "during the attempt to carry out" the robbery or attempted robbery.

## III.

■ In defendant's view, whether the evidence was sufficient for the jury to convict him of felony murder will depend on our resolution of his challenge to the jury instructions. Apparently, he is arguing that there was insufficient evidence of "malice" for the jury to convict him. We conclude that there was ample evidence to support the jury's determination that defendant acted, at minimum, in wanton disregard of the risk to human life when, during the course of an attempted robbery of a drug dealer, he pointed a loaded gun at one of the occupants of the drug dealer's house. Cf. *Brunell*, 159 Vt. at 8, 615 A.2d at 131 (jury could reasonably have found that defendant was aware of deadly risk of shaking and covering mouth of 20-month-old infant).

## IV.

■ Defendant also appeals from the trial court's denial of his motion for a new trial, which was based on juror misconduct and extraneous influence. He argues that the court should have granted his motion because (1) some jurors disregarded the court's instructions to leave their cars at home, which suggested that they intended to return a quick verdict; (2) the court informed the jurors that they would be sent to a hotel if they did not reach a verdict by ten o'clock in the evening, which may have pressured the jury into returning a quick verdict; (3) two members of the jury were exposed to media coverage, and some jury members discussed which jurors had read news accounts about the case; and (4) during deliberations, certain members of the jury complained that they wanted to finish quickly because they needed to get back to work or to attend social engagements.

The evidence on these points was submitted to the trial court in the form of two affidavits from jurors. At a hearing on defendant's motion for a new trial, the court ruled that the affidavits were wholly inadmissible because they contained material excluded under V.R.E. 606(b), which precludes jurors from commenting on matters that occurred during deliberations. Absent the affidavits, the court denied the motion for a new trial, ruling that it lacked supporting evidence. Defense counsel did not resubmit the affidavits without the forbidden material.

We find no abuse of discretion in the court's denial of defendant's motion. The court properly refused to consider statements by the jurors as to what may have influenced their deliberations. See *Bellows Falls Village Corp. v. State Highway Bd.*, 123 Vt. 408, 411–13, 190 A.2d 695, 697–98 (1963) (trial court may consider juror testimony that one juror took private view of land in dispute and that other jurors read newspaper editorial vilifying one side, but court may not consider testimony as to effect of these facts on jury's deliberation). Absent those statements, defendant's motion had little, if any, support. See *State v. Bogie*, 125 Vt. 414, 418, 217 A.2d 51, 55 (1966) (party seeking corrective action has burden of establishing sufficient facts in support of motion for new trial based on juror misconduct).

■ Defendant's evidence of extraneous influence falls far short of that required to overturn a jury verdict. First, the mere fact that some jurors brought their cars does not suggest prejudice. The court did not order, but merely suggested, that it might be easier if the jurors were dropped off because of the difficulty in predicting when a verdict would be reached. Second, we see no danger of prejudice in the court's message to the jurors that they would be sent to a hotel if they did not reach a verdict by ten o'clock that evening. See *State v. James*, 499 So. 2d 721, 727 (La. Ct. App. 1986) (no error where deputy sheriff informed jurors that they would spend night in hotel if verdict was not reached that evening; jurors were entitled to know such information). The jurors had already been advised to be prepared to stay overnight, and the court made it clear that it did not intend to suggest that it was imposing a time limit for reaching a verdict. Third, the pressures on jurors to return to work or to attend social engagements is part of the normal pressure on jurors sequestered during deliberations, and cannot be considered an extraneous influence sufficient to overcome a jury verdict, even assuming V.R.E. 606(b) permitted consideration of such factors. *James*, 499 So. 2d at

727 (comments by jurors that they wanted verdict by certain time due to social engagements did not warrant new trial).

Finally, regarding the jurors' exposure to news accounts, defendant does not indicate which articles the jurors read. There is no suggestion that the jurors were exposed to newspaper accounts such as the one in *Bellows Falls* — an editorial railing against one of the parties and expressing hope that the jurors would make a decision based on morality. 123 Vt. at 409–10, 190 A.2d at 696. The mere statement that some jurors were exposed "to news accounts, without more, is insufficient reason to cause a new trial." *State v. Searles*, 159 Vt. 525, 530, 621 A.2d 1281, 1284 (1993); see *Palmigiano v. State*, 387 A.2d 1382, 1386 (R.I. 1978) (juror's affidavit that other jurors had read press accounts during trial did not demonstrate prejudice where articles were "fair presentations of the testimony heard in open court").

*Affirmed.*