2012 VT 4

## State of Vermont v. Ali M. Abdi

[45 A.3d 29]

No. 10-255

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed January 26, 2012

*Thomas J. Donovan, Jr.*, Chittenden County State's Attorney, and *Andrew R. Strauss*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Anna Saxman*, Deputy Defender General, and *Marshall C. Pahl*, Montpelier, for Defendant-Appellant.

¶ 1. **Johnson, J.** Following a jury trial, defendant — a Somali Bantu immigrant to Vermont — was convicted of one count of aggravated sexual assault on a child. He moved for a new trial based, in part, on a claim of jury misconduct resulting from a juror's acquisition of information on the internet concerning

Somali culture, a subject that played a significant role at trial. The trial court held a hearing, questioned the jurors, and issued a written decision denying the motion. The court concluded that although the extraneous information had the capacity to affect the jury's verdict, it was harmless. For the reasons set forth below, we conclude otherwise, and therefore reverse the judgment and remand for a new trial.

¶ 2. The record evidence may be summarized as follows. In 2006, defendant emigrated with his family from Somalia to Burlington, Vermont, where he joined a small close-knit Somali Bantu refugee community. Defendant also helped his wife's sister and her three children relocate to Vermont. The two families frequently visited each other's homes. This case arose out of one of those occasions, when defendant was visiting his sister-in-law one evening in December 2006. Defendant's then-nine-year-old niece, K.A., testified that defendant was watching television in the living room when he asked her to bring him a glass of water and then told her to sit next to him. Defendant then put his hand under her pants and, as she testified, put his finger "where I pee."

¶ 3. K.A. stated that defendant had committed similar acts in the past. She also testified that, on other occasions, defendant had taken her into his bedroom and sexually assaulted her, or as she stated, "[h]e put[] his penis on my pee." On those occasions, she recalled that defendant would place his hand over her mouth to prevent her from crying out and would threaten her with harm if she revealed what had happened.

¶ 4. K.A.'s brother testified that, on the evening in question, he was in his bedroom with K.A. when defendant called for her. He stated that K.A. then went into the living room and sat next to defendant, and shortly thereafter he saw defendant with his "hand inside" K.A. He recalled that K.A. was wearing both a skirt and pants, and that he saw defendant's hand under her skirt, which was lifted up. K.A.'s brother immediately went into the kitchen to tell their mother.

¶ 5. K.A.'s mother reported the incident to her sister — defendant's wife — and they referred the matter to the "elders" of the Somali Bantu community. The next morning, a number of the elders went to defendant's house, where his wife, sister-in-law, K.A., and others were gathered, to investigate the report. Mohammed Ali, a leading elder in the community, testified to the role of Somali culture and the Muslim faith in their response to

allegations of this nature. He explained that the word of a child without an adult witness is generally considered insufficient evidence of sexual misconduct, and that further inquiry is required. Consequently, the elders met with defendant to question him. As Ali explained, their law and culture required that defendant be asked three times whether he had assaulted K.A. The first two times that defendant was asked he responded "no." The third time, however, he responded "yes." The elder explained that a third "no" would have required a subsequent "swearing," where each of the adult principals — defendant, his wife, and sister-in-law — would have been asked to swear on the Koran. He explained that, according to their faith, "something bad will happen to the person who did something, who's lying" when swearing on the Koran.

¶ 6. Based on defendant's final answer, the elders contacted the police. Defendant was arrested and charged with two counts of sexual assault on a child under thirteen, the first count based on the alleged digital penetration and the second on the alleged rape. In addition to the testimony of K.A., her brother, and several Somali Bantu elders, the State adduced the testimony of K.A.'s mother and aunt, the investigating officer, and a doctor who examined K.A. The doctor found no physical evidence of a sexual assault, although she explained that most young victims of sexual assault do not show physical symptoms.

¶ 7. Following a two-day trial, the jury returned a verdict of guilty on the first count, and hung on the second. As discussed more fully below, the court denied a subsequent motion for new trial based, in part, on allegations of jury misconduct. This appeal followed.

¶ 8. Defendant claims that the jury's exposure to extraneous prejudicial information acquired from the internet violated his right to a fair trial. The issue arose a few days after trial, when one of the jurors, A.R., contacted the court to discuss the verdict. Shortly thereafter, the court held a hearing with counsel present to question the juror. A.R. testified that during the second day of deliberations another juror read aloud the definition of "incompetent juror" from a piece of paper that was not in evidence. A.R. felt that the information was intended to be critical of her. On the day of the hearing, the deputy state's attorney submitted a letter to the court indicating that she had received similar information that one of the jurors went on the internet after the first day of

deliberations, printed out information concerning juror incompetence, and brought it to the jury room "to help deal with a juror who was being difficult during deliberations."

¶ 9. Based on this information, defendant filed a motion for new trial alleging, among other claims, jury misconduct. The court, in response, held another hearing over the course of three days in June, July, and August 2009 for the purpose of questioning each of the jurors concerning the matter. Nearly all confirmed that one juror had, in fact, recited a standard for incompetent jurors that was likely derived from the internet, that the information was directed at A.R., who some jurors thought was not performing adequately, and that it was discussed only briefly, if it all. During the course of the hearing, the court specifically questioned the jurors as to whether the information had influenced them in arriving at a verdict. All except A.R. responded that it had no effect. Several jurors noted that the information appeared to upset A.R., who — when recalled — testified that she had been holding out for acquittal, that she was intimidated by the implication of incompetence, and that it influenced her verdict.[1]

¶ 10. On the second day of the continued hearing, one juror, C.L., brought up an entirely different matter. When asked whether any member of the jury had referred to extraneous material during deliberations, he recalled that, during the second day of deliberations, "[o]ne of the jurors told us they [sic] went home and researched about the Somalian culture and their religion and bible and all that and he shared some of . . . his research that he uncovered." Under further questioning, C.L. recalled that the information was conveyed verbally, not through any printed material, and was discussed by the jury for "maybe ten, fifteen minutes." When asked how the information was "used, if at all," the juror responded: "What drives and motivates the Somalians and what may have influenced them to make their

---

[1] Although the phrasing of the trial court's questions varied slightly, their purpose at delving into the deliberative process of the jurors was consistent and unmistakable. For example, the court inquired of juror G.B.: "Did that definition or that paper influence you in arriving at your verdict?" Juror G.G. was asked: "Did that information influence your verdict in any way?" and also "Do you know if that description was used in any way to influence any [other] person to reach a verdict?" The court asked juror J.C.: "Was that description, role of a juror, for lack of a better word, was that used in any way to arrive at your verdict?" Juror C.K. was asked whether the information was "used in any way to influence that particular juror [A.R.] to arrive at a verdict."

decisions on the answers they gave and that type of thing." He acknowledged that the juror in question used the "information to interpret facts in evidence" and to "build their [sic] position on what they [sic] thought would be the appropriate judgment in this case." He inferred that the juror's intent was to use the information to influence others in arriving at a verdict. He could not "say for sure," however, whether it actually influenced anyone else, but believed that "the individual that did the research seemed to use [it] to reach their [sic] conclusions."

¶ 11. Following the hearing, defendant filed a supplemental motion for new trial alleging jury misconduct based on the additional disclosure. The State opposed the motion. In November 2009, the trial court issued a written ruling. On the juror-incompetence issue, the court concluded that the information did not relate to any material element or defense at trial and thus did not have the capacity to influence the verdict. As to the information on Somali religion and culture, the court concluded that, although an "irregularity" had occurred that had the capacity to affect the jury's verdict, "based on a preponderance of the evidence and the totality of the circumstances," the State had "prov[ed] the absence of prejudice." The court noted, in this regard, that none of the jurors other than C.L. had reported the irregularity, which suggested that "the internet research done by the one juror on Somali culture and religion was basically ignored by all the other jurors and did not affect their verdict." The court also observed that there was little evidence "describing the content of the information conveyed, or the context, and . . . no specific information indicating that it was inflammatory or directly related to any material issue in the case." Finally, the court found that evidence supporting guilt on Count I "was strong." Accordingly, the court denied the motion.

¶ 12. As noted, defendant renews his claim of jury misconduct on appeal. The legal standards governing a claim of this nature are reasonably settled if not — as this case suggests — entirely clear. "A defendant is entitled to a fair trial free of extraneous influences." *State v. Gorbea*, 169 Vt. 57, 60, 726 A.2d 68, 70 (1999). This right reflects, in turn, the Sixth Amendment guarantee that "the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Parker v. Gladden*, 385 U.S.

363, 364 (1966) (quotation omitted); see also *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."). Consideration by a jury of facts outside the evidence strikes at the heart of these rights. As one court has cogently explained: "When a jury considers facts in a criminal case which have not been introduced as evidence, the defendant has been deprived of the opportunity to be present when evidence is being presented, to be represented by counsel at an evidentiary proceeding during trial, to cross-examine the 'witnesses' who presented the evidence, to offer evidence in rebuttal, to request curative instructions, or to take other tactical steps, including argument to the jury, to place the evidence in perspective for the jury." *State v. Poh*, 343 N.W.2d 108, 117 (Wis. 1984).

¶ 13. To protect these fundamental rights and at the same time preserve the integrity and finality of the jury's deliberations, Rule 606(b) of the Vermont Rules of Evidence provides as follows:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received; *but a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention*, whether any outside influence was improperly brought to bear upon any juror, or whether any juror discussed matters pertaining to the trial with persons other than his fellow jurors.

(Emphasis added.) In applying Rule 606(b) to claims of exposure to "extraneous prejudicial information" we have evolved a two-part inquiry. *State v. Lee*, 2008 VT 128, ¶ 26, 185 Vt. 110, 967 A.2d 1161; *Gorbea*, 169 Vt. at 60, 726 A.2d at 70; *State v. McKeen*, 165 Vt. 469, 472, 685 A.2d 1090, 1093 (1996). "A defendant alleging . . .

extraneous influence . . . must first demonstrate that an irregularity occurred and [that] it had the capacity to affect the jury's result." *McKeen*, 165 Vt. at 472, 685 A.2d at 1093. Essentially the defendant must show that the jury was exposed to extraneous information relevant to an issue capable of affecting the verdict. See, e.g., *United States v. Bagnariol*, 665 F.2d 877, 888 (9th Cir. 1981) (holding that juror's independent research for references to nonexistent company created by FBI as a front for its investigation did not require new trial where the information had no logical connection to any material issue in dispute at trial); *Lee*, 2008 VT 128, ¶¶ 27-28 (upholding finding that alleged extraneous influence from presence of two police officers in courtroom did not have capacity to affect verdict since "[c]ourt security is now ubiquitous, and its presence does not necessarily show that defendant is incarcerated"). Once this is shown, the State must demonstrate "that the irregularity did not in fact prejudice the jurors against defendant." *McKeen*, 165 Vt. at 471, 685 A.2d at 1092; accord *Lee*, 2008 VT 128, ¶ 26; *State v. Squiers*, 2006 VT 26, ¶ 21, 179 Vt. 388, 896 A.2d 80.

¶ 14. The State's burden in this regard "is a heavy one." *McKeen*, 165 Vt. at 474, 685 A.2d at 1094. Indeed, as the State acknowledges, state and federal courts uniformly require a showing that the extraneous information was harmless beyond a reasonable doubt. See, e.g., *United States v. Scull*, 321 F.3d 1270, 1280 (10th Cir. 2003) (observing that when jurors "are exposed to extraneous information . . . the government can seek to prove the exposure . . . was harmless beyond a reasonable doubt"); *United States v. Swinton*, 75 F.3d 374, 382 (8th Cir. 1996) ("[W]here juror misconduct exposes the jury to factual matters not in evidence, we presume prejudice and require the government to prove beyond a reasonable doubt that the inappropriate activity did not harm the defendant."); *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986) ("The ultimate question is whether it can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict." (quotation omitted)); *State v. Yamada*, 122 P.3d 254, 259 (Haw. 2005) (noting that, where court determines that juror misconduct could prejudice defendant's right to fair trial, "the prosecution must show that the alleged deprivation of the right to a fair trial was harmless beyond a reasonable doubt" (emphasis omitted)); *State v. Armstrong*, 691 S.E.2d 433, 445 (N.C. Ct. App. 2010) (holding that trial court applied correct legal

standard in requiring state to prove that juror exposure to extrinsic information was harmless beyond a reasonable doubt); see generally *Influences on the Jury*, 37 Geo. L.J. Ann. Rev. Crim. Proc. 544, 545 (2008) (noting that Sixth Amendment claims of juror bias or misconduct "are subject to harmless error analysis" and that "[a]n error is harmless if it is beyond a reasonable doubt that the juror bias and misconduct did not contribute to the verdict").

¶ 15. In its evaluation of juror prejudice, the court must look to "the totality of the circumstances," including such factors as the nature and "content" of the extraneous information, its relative importance to a material issue in the case, whether it was "inflammatory in nature," the scope and extent of its consideration by the jury, and "whether the evidence to support the verdict was strong." *McKeen*, 165 Vt. at 474, 685 A.2d at 1094. Because many of these criteria involve a consideration of facts from the trial itself and the trial court's first-hand observation of the jurors, we have held that "every reasonable presumption" should be afforded the trial court's decision, and we will not disturb its ruling absent a showing of abuse or a withholding of discretion. *Id.* at 472, 685 A.2d at 1093; accord *Lee*, 2008 VT 128, ¶ 26; *Squiers*, 2006 VT 26, ¶ 20.

¶ 16. It is thus readily apparent that the inquiry under Rule 606(b) is strictly *objective* in nature, looking to the totality of the surrounding facts and circumstances to determine whether the extraneous information acquired by the jury had the capacity to influence the verdict, and, if so, whether we may nevertheless confidently conclude that it could not have prejudiced the result. See, e.g., *State v. Johnson*, 158 Vt. 508, 523-24, 615 A.2d 132, 140 (1992) (noting that defendant claiming error due to extraneous jury influence "need only demonstrate that the irregularity had the capacity to influence the result, not that it actually did so" (quotation omitted)); *State v. Woodard*, 134 Vt. 154, 157, 353 A.2d 321, 323 (1976) (explaining that, to demonstrate prejudice from extraneous information, "[t]he defendant did not have to show that the circumstances here existing actually did influence the jury").

¶ 17. Consistent with this objective standard, we have held that jurors may testify to the factual circumstances surrounding their exposure to extraneous information, but *not* to whether the information influenced their verdict. See *State v. Hudson*, 163 Vt.

316, 324, 658 A.2d 531, 536 (1995) (holding that trial court inquiring into claim of extraneous prejudicial information under Rule 606(b) "properly refused to consider statements by the jurors as to what may have influenced their deliberations"); *State v. Forte*, 159 Vt. 550, 561, 624 A.2d 352, 359 (1993) (observing for benefit of trial court on remand that we "seriously question the interrogation of the jurors on their reaction to the evidence"). As this and other courts have explained, an objective inquiry strikes the proper balance between "conflicting policies of the law," the one "designed to insure freedom of deliberation in the jury room" and the other "the paramount need of preserving the integrity" and fundamental fairness of jury trials. *Bellows Falls Vill. Corp. v. State Highway Bd.*, 123 Vt. 408, 411-12, 190 A.2d 695, 697-98 (1963) (holding that trial court "exceeded the limits of its authority" when it inquired of jurors as to whether presence of extraneous evidence influenced their verdict); see also *State v. Hidanovic*, 2008 ND 66, ¶ 13, 747 N.W.2d 463 (noting that Rule 606(b) "embodies a balance between the desire for finality and certainty on one hand and the need to achieve an acceptable level of fairness and accuracy on the other hand"); *Walsh v. State*, 166 S.W.3d 641, 646 n.2 (Tenn. 2005) (observing that Rule 606(b) "represents a compromise between important public policies" by precluding "inquiries into the jury's deliberative process while allowing juror testimony concerning objective incidents or events that constitute external or extraneous influences").[2]

¶ 18. Applying these principles to the case before us, we note several key facts at the threshold. First, the State does not challenge on appeal the trial court's findings that an irregularity in the form of the unidentified juror's internet "research" on Somali religion and culture "was brought up by the juror during deliberations" and that it had the capacity to affect the verdict. As the court found, "research about Somali culture and religion had the capacity to affect the jury's verdict, as jurors could have relied on it to interpret the testimony of the Somali witnesses and to determine the credibility of these witnesses." Nor does the State challenge the court's finding that the information "was discussed

---

[2] Although, to be sure, one of the factors listed in *McKeen* for evaluating juror prejudice is "whether the juror testified that he or she was influenced by the communication," 165 Vt. at 474, 685 A.2d at 1094, we are not persuaded that this isolated statement was intended to overturn longstanding precedent to the contrary.

for maybe ten to fifteen minutes" during deliberations and used by the juror "to support his own position."

■■ ¶ 19. The question resolves, therefore, to whether the trial court correctly concluded that the State had met its heavy burden of proving the information was not prejudicial. *McKeen*, 165 Vt. at 474, 685 A.2d at 1094. Here we note at the outset that the trial court mistakenly applied a preponderance-of-the-evidence standard to the question of harmless error, but even ignoring this fundamental error we cannot affirm the judgment. As noted, the trial court based its decision on several factors. First, it found significance in the fact that no other juror reported the matter, suggesting that the extraneous information did not affect the verdict of the other eleven jurors. It is well settled, however, that a defendant is "entitled to be tried by 12 . . . impartial and unprejudiced jurors." *Parker*, 385 U.S. at 366 (rejecting government's argument that fair trial was preserved where ten of twelve jurors testified that they had not heard prejudicial out-of-court statements by bailiff). Thus, "if even a single juror's impartiality is overcome by an improper extraneous influence, the accused has been deprived of the right to an impartial jury." *Fullwood v. Lee*, 290 F.3d 663, 678 (4th Cir. 2002); accord *Krause v. Rhodes*, 570 F.2d 563, 569 (6th Cir. 1977) ("If a single juror is improperly influenced the verdict is as unfair as if all were." (quotation omitted)); *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977) ("If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel."); *People v. Harris*, 185 P.3d 727, 752 (Cal. 2008) ("Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors, it is settled that a conviction cannot stand if even a single juror has been improperly influenced." (quotation omitted)).

¶ 20. The trial court also cited the absence of additional evidence delineating the precise content of the information conveyed by the juror concerning Somali religion and culture or indicating that it was "inflammatory" or "directly related to any material issue in the case." While it may be true that the disclosure was short on substance, there is no doubt that the information related directly to a subject that pervaded the trial from start to finish — Somali Bantu culture and its impact on the behavior and testimony of the trial witnesses. To recall, for example, the State adduced testimony from several Somali Bantu

elders suggesting that defendant ultimately confessed to the assault to avoid the dire consequences of lying on the Koran. Defendant argued from the *same* evidence, however, that the admission was solely to spare his wife from suffering the same fate. "You may not believe it, it's not something that's part of your culture, but what we believe isn't what matters here," defense counsel argued. "[I]t was damned if you do, damned if you don't. The only way that [defendant] could save his family . . . in a way that wouldn't be catastrophic was to say I admit it."

¶ 21. The State argued, similarly, that K.A.'s testimony was believable based, in part, on testimony that Somali Bantu culture forbids a sexual assault victim from marrying another Somali Bantu person. "[S]he told her [mother] knowing that she was going to make her mother very sad," the State argued, "knowing that she was going to probably never be able to marry a Somali Bantu man when she grew up, and yet she told her story anyhow." Defendant countered on the basis of evidence that Somali Bantu law forbids divorce except in limited circumstances, including sexual misconduct, and that defendant's wife had in-quired about obtaining a divorce prior to the incident, thus suggesting a motive to fabricate the charges against defendant. The defense even invoked culture to explain defendant's seemingly light-hearted demeanor during trial, recalling testimony that the accusation of a child is "not taken seriously or permitted to make a difference in Somali Bantu culture." He "did not consider it possible in his culture," the defense asserted, "to be convicted on the word of a child."

¶ 22. Although the State argued that the case ultimately in-volved a crime, not a culture, the defense was certainly the more correct in observing that Somali Bantu religion and culture were central to the jury's understanding. As defense counsel observed, almost all of the witnesses were Somali Bantu and this "put a twist on everything" that the jury heard. It was essential, counsel argued "to understand the people and . . . the[ir] ideas in order to understand the evidence." Thus, counsel concluded: "If you don't understand the culture, you don't understand the evidence, you don't understand the people. . . . Don't let the State tell you otherwise."

¶ 23. The record thus demonstrates that Somali Bantu religion and culture lay at the heart of this case, and it is simply impossible to conclude that outside information used by at least

one juror — as the trial court found — to "interpret the testimony of the Somali witnesses and to determine the credibility of these witnesses" could have had no impact on the verdict. See, e.g., *People v. Staggs*, 740 P.2d 21, 23 (Colo. App. 1987) (reversal required where outside research by juror bore on credibility of defendant's and victim's version of events); *State v. Augustin*, 971 P.2d 304, 307-08 (Haw. Ct. App. 1998) (affirming trial court's conclusion that juror's outside investigation revealing defendant's welfare status "could have affected her assessment of the credibility of [defendant's] statement" and "therefore her verdict" and thus required reversal); *State v. Cook*, 676 S.W.2d 915, 917 (Mo. Ct. App. 1984) (outside information acquired by juror and conveyed to another juror could not be deemed harmless where it may have "adversely affected the credibility" of defense witnesses); see also *State v. Corey*, 151 Vt. 325, 328, 561 A.2d 87, 88 (1989) (holding that mistrial was required where outside evidence viewed by jury "bore directly on defendant's trial theory . . . and, as a result, had the capacity to affect his rights prejudicially"). Whatever the merits of the trial court's finding that the evidence of guilt "was strong," it cannot be separated from the fact that the verdict turned exclusively on the jury's credibility assessment of the testimony at trial. Accordingly, we conclude that the judgment must be reversed, and the matter remanded for a new trial before an impartial jury.

¶ 24. Our holding renders it unnecessary to address the impact, if any, of the extraneous information concerning juror incompetence or defendant's other claims. We note, however, that the trial court's explicit inquiry here into whether the information influenced each juror's verdict plainly exceeded the limitations of its authority under Rule 606(b). However worthy the motive, a court may not delve into how jurors arrived at their verdict, but must confine its inquiry to the objective events surrounding the alleged receipt of outside evidence. *Hudson*, 163 Vt. at 324, 658 A.2d at 536; *Bellows Falls*, 123 Vt. at 412, 190 A.2d at 698.

¶ 25. We note, as well, the increasing problem of jurors consulting the internet for outside information that this case all too clearly illustrates. See generally G. Blum, Annotation, *Prejudicial Effect of Juror Misconduct Arising from Internet Usage*, 48 A.L.R.6th 135 (2009) (collecting cases). Although Vermont trial courts routinely admonish jurors not to consult outside sources, it may well be time to consider a stronger and more technology-

specific admonition similar to the standard instruction employed, for example, in Colorado.[3] See L. Lee, Comment, *Silencing the*

[3] Colorado Civil Jury Instruction 1:5 provides, in its entirety, as follows:

> As jurors, your job is to decide this case based solely on the evidence presented during the trial and the instructions that I will give you. You are not investigators or researchers, so you must not read or use any other material of any kind to obtain information about the case or to help you decide the case. This prohibition applies, for example, to: dictionaries; medical, scientific, or technical publications; religious books or materials; law books; and the Internet. I want to emphasize that you must not seek or receive any information about this case from the Internet, which includes Google, Wikipedia, blogs, and other web sites.
>
> If you were to violate this rule by receiving outside information about the case, it could force me to declare a mistrial, meaning that the trial would have to start over before a different jury, and all of the parties' work, my work, and your work on this trial would be wasted.
>
> Therefore, it is very important that you not receive outside information about this case, whether it comes from other people, from the media, from books or publication, or from the Internet. You are free to use the Internet, but only for purposes unrelated to this case. Do not search for or receive any information about the parties, the lawyers, the witnesses, the judge, the evidence you will hear, or any place or location mentioned during the trial. Do not research the law. Do not look up the meaning of any words or scientific or technical terms used during the trial. If necessary, I will give you definitions of words or terms before you begin your deliberations.
>
> Also, you are not allowed to visit any place(s) involved in this case. If you normally travel through such a place, you should try to take a different route until I tell you that your jury service is completed. If you cannot take a different route, you must not stop or attempt to gather any information from that location.
>
> Until I tell you that your jury service is completed, do not communicate with anyone, including family and friends, about the evidence or the issues in this case. This prohibition applies to all forms of communication, including in-person conversations, written communications, telephone or cell phone calls, and electronic communications through any device. For example, you must not communicate about this case by email, text messages, Twitter, blogging, or social media like Facebook.
>
> When court is not in session, you may communicate about everything other than this case. You may tell others that you are on a jury and that you cannot talk about the trial until it is over, and you may tell them the estimated schedule of the trial, but do not tell them anything else about the case. If anyone tries to communicate with you about anything concerning the case, you must stop the communication immediately and report it to the Bailiff, who will notify me.

*"Twittering Juror": The Need to Modernize Pattern Cautionary Jury Instructions to Reflect the Realities of the Electronic Age,* 60 DePaul L. Rev. 181, 197, 202 (2010) (observing that the internet has been " 'wreaking havoc' in courtrooms" and suggesting a need for new "technology-inclusive" cautionary instructions). We can not ignore the realities of our "information age," where the internet and other technologies have made information more widely and immediately accessible than ever before.

*Reversed and remanded for a new trial.*

---

Colo. Jury Instr., Civil 1:5 (4th ed. 2010). Although this standard instruction is designed to be given before trial, it may be prudent to repeat such an instruction, or an abbreviated version of it, before recesses during trial and as part of the final instructions to the jury.