SUSAN MARKEE & another[1] *vs.* MICHAEL BIASETTI & another.[2]

Essex. January 7, 1991. - August 6, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Jury and Jurors. Evidence*, Relating to deliberation by jurors. *Practice, Civil*, Conduct of juror, New trial.

In a civil action, once the party moving for a new trial demonstrates that the jury were exposed to an extraneous influence, the burden shifts to the nonmoving party to show that no reasonable likelihood exists that the extraneous matter would have affected the verdict of a hypothetical average jury [788-789]; however, in circumstances where the moving party showed that, during the thirteen-day trial of a case arising from a motor vehicle accident, certain jurors took unauthorized views of the accident location, and, while there, made measurements and observations, the jury could not fairly be considered a hypothetical average jury for the purpose of assessing possible prejudice, and a new trial was required [789]. WILKINS, J., with whom ABRAMS, J., joined, concurring.

CIVIL ACTION commenced in the Superior Court Department on February 7, 1985.

The case was tried before *Peter F. Brady*, J., and a motion for a new trial was heard by him.

The Supreme Judicial Court granted a request for direct appellate review.

*Carmen L. Durso* (*Mark F. Itzkowitz* with him) for the plaintiffs.

*Anil Madan* (*Georgia B. Vrionis* with him) for the defendants.

[1]Jason M. Ray, the minor child of Susan Markee.
[2]Surf Taxi of Lynn, Inc.

NOLAN, J. In this case, we are asked to decide whether the fact that members of the jury took an unauthorized view warrants disturbing the verdict and granting a new trial. We conclude that, under the facts of this case, a new trial is warranted.

This case originates in an event which occurred on January 14, 1985. On that day, the defendant, Michael Biasetti, was driving a taxi carrying three passengers on Western Avenue in Lynn. The taxi cab turned right onto Lawton Avenue in Lynn and struck six year old Jason M. Ray, severely injuring him. On February 7, 1985, the plaintiffs filed a complaint in the Superior Court alleging negligence, loss of consortium, and emotional distress.

The taxi's rate of speed at the time of the accident was a hotly contested issue at trial. Witnesses for the plaintiffs gave testimony regarding the speed of the vehicle. Marie Clayton, a passenger, testified that the taxi was travelling at approximately thirty-five miles per hour before the turn onto Lawton Avenue and forty miles per hour after the turn. Alison Breedy, a young girl who was walking on Lawton Avenue when she witnessed the collision, testified that the taxi cab "flew down the street." Burdett Day was a motorist who observed the cab as it travelled down Lawton Avenue. He testified that he heard the "squealing of rubber" as the taxi rounded the corner. All of the witnesses for the plaintiff were vigorously cross-examined on this issue.

The defendants presented an accident reconstruction expert. The expert testified that, based on tests that he had conducted at the scene, it was his opinion that the accident was unavoidable. He based this opinion on the speed of the car, and the amount of time available to brake after the driver could have seen the little boy. The expert also testified as to his opinion of the speed of the vehicle at the time of the collision. He based his opinion as to speed on tests he conducted at the scene regarding the point of impact and the point where the child landed after impact.

Also in dispute was exactly when the child appeared in the roadway. There was conflicting evidence at trial as to

whether the child darted, ran, trotted, or walked into the street. Biasetti admitted that he first saw the child in the street. He stated that he then applied the brakes and swerved to try to avoid the boy.

On December 12, 1989, after thirteen days of trial, the judge instructed the jury. Finally, on the last day of deliberations, the judge cautioned the jury that they were not to visit the scene of the accident as it would "toss out" the case. None of the jurors made any response to this instruction.

The jury returned a verdict in favor of the defendants. On that same day, one juror, whom we shall call juror A, communicated with the plaintiffs' attorney to report that he and another juror, juror B, had taken unauthorized views of the accident scene. On the basis of that conversation, the plaintiffs filed motions for a new trial and for a postverdict inquiry of the jurors.

*Motion for a new trial.* On January 2, 1990, the judge held a hearing on the plaintiffs' motions. Subsequent to the arguments, the judge interviewed both juror A and juror B. Juror A testified that he had visited the scene three times, twice alone and once with juror B. Although juror A could not remember the exact dates of his visits, he estimated that the first time was on the first day of the trial. On that day he went to the scene and just observed traffic. He testified that about one week later he did the same thing. Juror A stated that about three or four days before deliberations started, he visited the scene for a third time with juror B. On the day that he and juror B went to the scene, juror A testified that he parked in the same location as that which Burdett Day, a witness for the plaintiffs, had described as being the scene of "his view of what he could see." Juror A said that he had parked at this location on the two prior occasions as well.

On the day that he and juror B visited, juror A testified that they paced off distances across Lawton Avenue and an adjacent street. They also "looked [to] see how far it was from where Jason was struck to the corner; just observed cars taking the corner, how fast they could go." While viewing the scene, he and juror B spoke about the case. Juror A

further testified that juror B had spoken to a number of the jurors about driving tests that he (juror B) had conducted at the scene on a different occasion.

Juror B was also questioned at the hearing. He verified that about one week to ten days into the trial, he and juror A had visited the scene together. He further testified that he had taken some measurements of the street because he had doubt as to its width. He also paced off from where he thought the impact point was to where the child landed to estimate some distances. Juror B also testified that about one week before deliberations began, he made a second visit to the scene by himself. On this occasion, he turned from Western Avenue onto Lawton Avenue "to see what speed could be generated in the distance between there and the . . . place where the boy was struck." Juror B stated that he had told other jurors about his visits to the scene.

During the hearing, juror B testified that two other jurors, whom he named, had also visited the scene during the course of the trial. The plaintiffs moved for leave to question those jurors, but the motion was denied. The judge also denied the plaintiffs' motion for a new trial based on the jury's exposure to this extraneous material. The plaintiffs appealed. We granted their application for direct appellate review.

We note at the outset that the extraneous influence to which the two jurors were exposed violated the principle that litigants are entitled to a fair trial, based on information presented according to the rules of evidence. This type of outside interference is very serious. This case underscores the need for an early and strong instruction by the judge on the responsibilities of the jurors. We turn to how this unfortunate interference is to be remedied.

In *Commonwealth* v. *Fidler*, 377 Mass. 192, 201 (1979), we determined that a criminal defendant would have the initial burden of demonstrating that the jury were in fact exposed to an extraneous influence. Once the defendant has done so, the burden would then shift to the Commonwealth to show that the defendant was not prejudiced by the extraneous matter. *Id.* We see no reason to depart from this rea-

soning for civil cases. Here, the moving party has established that the jurors were exposed to an outside influence. Therefore, the burden shifts to the nonmoving party to demonstrate that there is no reasonable likelihood that the party was prejudiced by what occurred.

We have previously held that inquiry into jury deliberations is not proper. In *Commonwealth v. Fidler, supra* at 195, we reiterated the long-established proposition that courts are required to protect jurors and their verdicts from unwarranted intrusions. To uphold the integrity of the verdict and to keep the jury free from unwarranted intrusions, juror testimony is generally not admissible to impeach the jury's verdict. See *Woodward* v. *Leavitt,* 107 Mass. 453, 460 (1871).

In *Fidler,* we directed the judge to "focus on the probable effect of the extraneous facts on a hypothetical average jury." *Id.* at 201. The present case does not lend itself to the same approach because this jury have proved that they are anything but an average jury. The average jury do not personally become involved in outside investigations regarding the case before them. We could not with confidence say that this jury could fairly be modeled by a "hypothetical average jury."

As a result, there is no method by which fairly to assess the prejudice to the party moving for a new trial (the plaintiffs). The defendants, therefore, are unable to sustain their burden of demonstrating no reasonable likelihood that the plaintiffs were prejudiced by what occurred. Hence, a new trial is required.

*So ordered.*

WILKINS, J. (concurring, with whom Abrams, J., joins). I disagree with the court that the general rule in a civil action is that, once evidence of an extraneous influence on a jury is proved, a new trial follows automatically unless the party who prevailed before the jury can demonstrate that there is

no reasonable likelihood that the losing party was prejudiced by what occurred. In this case, the court unnecessarily throws its intellectual hands up and rules there must be a new trial because there is no way fairly to assess the prejudice to the plaintiffs.

The proper rule should be that, to obtain a new trial, the losing party must establish prejudice in the sense that the jury might reasonably have reached a different result if they had not had the extraneous information before them. Cf. *DeJesus* v. *Yogel*, 404 Mass. 44, 48-49 (1989) (standard for granting new trial because of erroneous exclusion of evidence: whether trier of fact would have reached different result with excluded evidence before it).

This case involves more than an unauthorized view by members of a jury, as the court initially characterizes the case. The jurors who went to the accident scene not only took a view, but they acted as amateur experts. They went so far beyond their proper role of deciding the case on the evidence presented in court that the likely prejudice to the plaintiffs is established as a matter of law.

The difference in the placing of the burden concerning prejudice makes no difference in the conclusion the court and I reach. For the future, however, a requirement that the losing party must show that she was prejudiced by extraneous information before the jury seems preferable to a rule that places the burden on the winning party. The concern for the rights of criminal defendants that placed the burden on the Commonwealth to disprove prejudice in *Commonwealth* v. *Fidler*, 377 Mass. 192, 201 (1979), has no parallel in a civil action. Where else does a party in a civil action obtain a new trial without showing that an error in the trial was prejudicial? See G. L. c. 231, §§ 119 and 132 (1990 ed.) (no new trial unless the error "injuriously affected the substantial rights of the parties").