COMMONWEALTH vs. CHARLES CUFFIE, THIRD.

No. 91-P-729.

Hampden. May 8, 1992. - August 21, 1992.

Present: KASS, JACOBS, & GILLERMAN, JJ.

Further appellate review granted, 413 Mass. 1106 (1992).

*Jury and Jurors. Practice, Criminal*, Conduct of juror, Interrogation of jurors, Instructions to jury. *Evidence*, Relating to deliberation by jurors. *Identification. Controlled Substances.*

The judge at a criminal trial acted within his discretion in denying the defendant's posttrial motion for leave to interview a juror who was reported to have visited the location of the crime while the trial was in progress [214-216], and, although the judge himself should have interviewed the potentially influenced juror, his failure to do so did not require reversal where, on the record developed at the trial, the appearance of the crime scene had no relevance to the finding the jurors were required to make [216].

At a criminal trial, the judge's instructions to the jury on the subject of identification, following the pattern recommended in *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 310-311 (1979), contained no reversible error, either in the omission of language about the advantages of lineup over showup identification or in the inclusion of a flawed reference to "the length of time that lapsed between the occurrence of the crime and the next opportunity of the witness to see the defendant." [216-218]

At the trial of a defendant on drug trafficking and conspiracy charges, where the evidence, viewed most favorably to the Commonwealth, showed that the defendant and another individual had been selling crack cocaine out of the same inventory, knowledge of a quantity of the drug carried by the other individual was properly imputed to the defendant. [218]

INDICTMENTS found and returned in the Superior Court Department on May 10, 1989.

The cases were tried before *William W. Simons*, J.

*Brownlow M. Speer*, Committee for Public Counsel Services, for the defendant.

*Judith Ellen Pietras*, Assistant District Attorney, for the Commonwealth.

KASS, J. An earlier trial of this case ended in a declaration of mistrial because a juror had independently visited the scene of the crime. Although the judge at the second trial had taken pains to instruct the jury that they were not to explore the site where the crime had occurred, there was reason to apprehend that lightning had struck again. After the jury in the second trial returned their verdicts, a juror asked to see the judge and reported to him in chambers that another juror had said she had, on her own, visited the forbidden spot. On the basis of an interview with the reporting juror, the judge decided that the verdicts could stand. The defendant claims that a mistrial was again required. A second claim of error concerns nuances in the cautionary jury instructions — the *Rodriguez* charge — concerning identification of the accused. Finally, the defendant claims that knowledge of 27.55 grams of crack cocaine found on another individual was improperly imputed to him. We are of opinion that none of the claims of error requires reversal and affirm the judgments of conviction.

The defendant Cuffie was convicted of trafficking in cocaine in an amount of twenty-eight grams or more and of conspiracy to commit that offense. Taking the evidence in a view most favorable to the government, the jury could have found that Cuffie was a runner for a drug dealer named Brian Person. Cuffie and Person came under police surveillance as they sold cocaine in front of 189 Quincy Street, Springfield. Officer Ricky Moran of the Springfield police watched them from inside a car through binoculars at a distance somewhat less than 100 feet. After three transactions and about ten minutes of observation, the police made their move. They caught Person, but Cuffie managed to flee. Officer Moran broadcast to other surveillance units in the area a description of Cuffie: black male, five feet, nine to ten inches tall, wearing a tan sheepskin three-quarter length jacket with fur trim. Another police officer, Daniels, spotted a man who answered the description running in an alley less than

one-tenth of a mile from the place where (in front of 189
Quincy Street) he had originally been watched by Officer
Moran. Daniels took the defendant to that place, and Moran
there identified the defendant as the man whom he had ob-
served apparently selling drugs with Person. There were 1.32
grams of crack cocaine in the defendant's right rear trouser
pocket.

Cuffie's defense was misidentification: the police had the
wrong man. He testified that on the day of his arrest he had
been riding around "nowhere special" with a friend, Richard
Parker, who also so testified. At around 5 P.M., he had gone
to a Mr. Fish establishment, located near where he was ar-
rested, to buy a box of chicken wings. He was hurrying the
chicken wings to a cousin who lived nearby, indeed, just past
the alley where the police unaccountably swooped down upon
him. Person, the alleged dealer, was a total stranger to him,
Cuffie said. The cocaine in Cuffie's back trouser pocket was
for his own use. At the time of Cuffie's trial, Person was al-
ready serving a mandatory prison sentence on a conviction of
trafficking in cocaine arising out of the transactions in which
the police charged Cuffie had participated. Person testified
that he did not know Cuffie and that Cuffie had nothing to
do with his drug dealing that day or at any other time.

1. *The possibility of extraneous influences on the jury.* Ju-
ries are to arrive at their verdicts on the basis of testimony
and such physical evidence as is offered. They are not to be
exposed to extraneous influences such as communications to
them about the case outside the evidence, the independent
research of a member of the jury, and, as a subcategory of
the latter, the independent taking of a view by a juror of the
physical setting of the case. See *Harrington v. Worcester,
Leicester, & Spencer St. Ry.*, 157 Mass. 579, 580-581
(1893);[1] *Commonwealth v. Fidler*, 377 Mass. 192, 200

---

[1]The juror in that case was exceptionally energetic. Not only did he visit
the scene of the accident alone, but he also dropped into a nearby store
and asked the properietor if he had seen the accident, whether the electric
cars had run faster the previous fall, and then, spotting a witness, asked
him where he was standing at the time of the accident.

(1979); *Markee* v. *Biasetti*, 410 Mass. 785, 788-789 (1991); *People* v. *DeLucia*, 20 N.Y.2d 275, 279 (1967).[2] See generally *Commonwealth* v. *Gilchrist*, 413 Mass. 216, 219-220 (1992); *Commonwealth* v. *Scanlan*, 9 Mass. App. Ct. 173, 182-184 (1980).

After the jury had been discharged, juror #6-2 stayed in the courthouse and asked to see the judge. He met with her in chambers and on the record. She told the judge that a juror[3] had said "she went to the scene to check it out." The judge was faced with the delicate task of inquiring into whether the jury or a member of it had been subjected to an extraneous influence, without getting into the jurors' thought processes. See *Commonwealth* v. *Fidler*, 377 Mass. at 203. The reporting juror said the juror who had made the site visit had not mentioned any particular thing about the scene, that she had not in her discussions used information regarding the scene, and that the scene was not brought up in the jury deliberations. On the basis of his exchange with the reporting juror, the judge concluded that no extraneous influence had contaminated the deliberative process in which the jury had engaged.

Counsel for the defendant moved for leave to interview the juror who may have taken the unauthorized view, but that motion was denied. Postverdict interviews of jurors by counsel are not favored, *Commonwealth* v. *Fidler*, 377 Mass. at 203, and are not constitutionally required, *Commonwealth* v. *Mahoney*, 406 Mass. 843, 856 (1990), although, if a preliminary interview furnishes a basis for a further interview, the presence of counsel is necessary. *Ibid.* Denial of the motion for an interview by counsel was within the judge's discretion. See *Commonwealth* v. *Dixon*, 395 Mass. 149, 151-152 (1985). A troublesome aspect of the inquiry is that it focused only on the effect by the errant visit (assuming it occurred) on the other jurors. It is also necessary to examine the juror who took the unauthorized view to determine whether she

---

[2]In the *DeLucia* case, several jurors not only went to the scene but also reenacted the alleged crime.

[3]Identified inferentially as juror #5-1.

had been subjected to extraneous influence. See *People* v. *DeLucia*, 20 N.Y.2d at 279-280. The entire jury need not have been infected.

Although the judge ought to have interviewed the potentially influenced juror, the failure to do so did not constitute reversible error per se. Here the judge decided after the first interview that the juror's view was inconsequential because "it is clear that a view of a busy public street did not result in any prejudice." Otherwise expressed, there was nothing to see at the scene of the alleged crime that bore on whether the police grabbed the right man. Such a conclusion is borne out by the record. Although, before trial commenced, the defense had unsuccessfully moved for a view of the alleged drug transaction site, as the trial was in fact played out, neither prosecutor nor defense counsel asked any question of any witness about ability to see, lighting conditions, obstructions to sight lines, crowd or traffic interference, or any other physical characteristic of the scene of the alleged crime that might have had a bearing on the ability of the police officers, notably Officer Moran, to see and identify from their observation post. On the facts developed, what the scene of the alleged crime actually looked like (the government had prepared a chart to assist in orienting the jurors) had no relevance to the finding the jury were required to make. The juror's unauthorized frolic was harmless beyond a reasonable doubt. See *Commonwealth* v. *Fidler*, 377 Mass. at 201; *Commonwealth* v. *Jones*, 15 Mass. App. Ct. 692, 695-696 (1983); *People* v. *Sutter*, 134 Cal. App. 3d 806, 820-821 (1982); 4 Wharton, Criminal Procedure § 604 (12th ed. 1976).

2. *The identification instruction.* On the general subject of identification, the trial judge instructed the jury according to the pattern recommended in *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 310-311 (1979). It is well to bear in mind that the *Rodriguez* recommendation, drawn from *United States* v. *Telfaire*, 469 F.2d 552, 558-559 (D.C. Cir. 1972), does not require word for word tracking. See the appendix to *Commonwealth* v. *Rodriguez*, 378 Mass. at 310 n.1. The de-

fendant complains, on the one hand, of an omission and, on the other hand, of too strict adherence to the *Rodriguez* model.[4]

The omission is of the paragraph from the appendix to *Rodriguez, supra* at 311, which reads:

> "You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness."

Inclusion of that language would have been appropriate, but, hearing the judge's identification instructions as a whole, the jury could have been left in no doubt that identification is subject to suggestion and error and that they must consider handicaps to observation, suggestiveness, and the possibility of good faith mistake by an identifying witness. The judge, drawing on *Rodriguez,* expressly told the jurors to ask themselves: "Are you satisfied that the identification made by the witness after the offense was the product of his own recollection? . . . If the identification by the witness may have been influenced by the circumstances under which the defendant was presented to him for identification, then you should scrutinize identification with great care." We do not think omission of the language about the advantages of lineup over showup identification was reversible error. Cf. *Commonwealth* v. *Gonzalez*, 28 Mass. App. Ct. 906, 907 (1989), which perhaps criticizes omission of the lineup versus showup language but does not categorize the omission as erroneous.

That portion of the *Rodriguez* pattern to which the judge, according to the defendant, too literally adhered is the sentence which reads:

> "You may also consider the length of time that lapsed between the occurrence of the crime and the next op-

---

[4]We think defense counsel adequately called his objections to the attention of the trial judge.

portunity of the witness to see the defendant, as a factor bearing on the reliability of the identification."

The flaw is subtle; it is that the words "next opportunity of the witness to see the defendant" imply that the witness has seen the defendant before. In *Commonwealth* v. *Fitzpatrick*, 18 Mass. App. Ct. 106, 111 & n.8 (1984), we suggested a modification:

"You may also consider the length of time that lapsed between the occurrence of the crime and the opportunity of the witness, some time after the occurrence of the crime, to see and identify the defendant as the offender, as a factor bearing on the reliability of the identification."

Although the *Fitzpatrick* variation avoids the suggestive potential of the original, we do not think failure to employ it is reversible error. Particularly in relation to the facts of this case, when only two minutes or so elapsed between the time the police tried to arrest Cuffie and the time of his identification by Officer Moran, the paragraph of the instructions dealing with elapsed time has a tangential quality.

3. *Sufficiency of evidence as to trafficking.* The police found 27.55 grams of crack cocaine on Person when they apprehended him and 1.32 grams on Cuffie, a total of 28.87 grams. Trafficking in more than twenty-eight grams carries a minimum five-year sentence to State prison. G. L. c. 94C, § 32E(*b*)(2). The defendant moved for required findings of not guilty on the ground that knowledge of the cocaine carried by Person could not be imputed to the defendant. The motion was properly denied. Taken in the view most favorable to the Commonwealth, the evidence showed that Cuffie and Person were dealing out of the same inventory, and the inference was reasonable and possible that Cuffie knew what that inventory was. See *Commonwealth* v. *Santiago*, 30 Mass. App. Ct. 207, 217-219 (1991).

*Judgments affirmed.*