NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 128

No. 2014-463

| | |
|---|---|
| Amy Labate & Robert Labate, Individually and On Behalf of Minor Daughter, J.L. | Supreme Court |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, Civil Division |
| Rutland Hospital, Inc. d/b/a Rutland Regional Medical Center and Santiago Cancio-Bello, M.D. | |
| | May Term, 2015 |

William D. Cohen, J.

Anthony Z. Roisman, Weathersfield, and Mark R. Mueller of Muller Law Offices, Austin, Texas, for Plaintiffs-Appellants.

Peter B. Joslin and Keith Aten of Theriault & Joslin, P.C., Montpelier, for Defendant-Appellee Santiago Cancio-Bello, M.D.

Allan R. Keyes of Ryan Smith & Carbine, LTD., Rutland, for Defendant-Appellee Rutland Hospital, Inc. d/b/a Rutland Regional Medical Center.

PRESENT: Dooley, Robinson and Eaton, JJ., and Morse, J. (Ret.) and Davenport, Supr. J. (Ret), Specially Assigned

¶ 1.     **EATON, J.**   This is an appeal of a jury verdict in favor of Rutland Hospital, Inc., d/b/a Rutland Regional Medical Center, and related entities ("RRMC")[1] and Dr. Santiago Cancio-Bello arising from injuries due to claimed medical malpractice in connection with the birth of Amy and Robert Labates' daughter on August 3, 2007. A jury trial was held in Rutland Superior Court, Civil Division, between August 11 and August 22, 2014. Following the return of the jury

---

[1] Although suit was brought against several entities related to Rutland Hospital, for ease of reference they are jointly considered as RRMC, with the exception of Dr. Cancio-Bello.

verdict in favor of RRMC and Cancio-Bello, the Labates moved for a new trial on several different grounds, many of which concerned alleged juror misconduct, including a claim that a juror read an e-mail sent by RRMC to its employees during the trial and therefore tainted the verdict. The trial court denied the motion without a hearing and this appeal followed. The only issue before this Court concerns that e-mail. For the reasons stated herein, we affirm.

¶ 2.     On July 30, 2010, the Labates filed a complaint against RRMC and Cancio-Bello for medical malpractice, see 12 V.S.A. § 1908, alleging that the care they rendered in delivering the Labates' child was negligent. Defendants answered individually, each denying all claims of malpractice and asserting various affirmative defenses, and the case proceeded through discovery to trial. On May 20, 2014, the parties drew a jury. During the voir dire, a prospective juror made the following disclosure: "Just to put it out there to the court, I have worked there [RRMC] for 10 years, also, with the doctor. I pride myself—I'm pretty objective. I just want to put that out there, the fact that I do objectively work there."

¶ 3.     In follow-up questioning, the prospective juror disclosed that he did security work at RRMC.[2] The capacity in which he did the security work, whether as an employee of RRMC or otherwise, was never established. At the conclusion of the voir dire, the parties exercised for-cause and peremptory challenges to exclude certain jurors. The above-mentioned prospective juror was neither challenged for-cause nor the subject of a peremptory challenge by any party. None of the parties exhausted the entirety of their allotted peremptory challenges and the above-mentioned prospective juror ultimately sat on the case through verdict.

---

[2] As the transcript of the voir dire reflects, the prospective juror attempted to clarify what he meant by "I do security there." The record provided by the Labates indicates that the juror said: "So I hold the people down while [Cancio-Bello] takes care of them." The transcript provided by Cancio-Bello recites that the juror said: "So I know the people (indiscernible)." These discrepancies in the transcript, which were provided by two independent transcript companies, reveals that the juror's statements of "I do security there" is susceptible to at least two interpretations.

2

¶ 4. The trial began on August 11, 2014, nearly three months after the jury had been selected. Before opening statements, the trial judge asked the jury panel: "And has anyone heard anything about this case or done any outside research since the jury draw which was—which was a few months ago?" None of the jurors indicated having heard anything about the case during the interim.

¶ 5. At the conclusion of the first day of testimony, the trial judge gave a cautionary instruction to the jury as follows:

> The Rutland Herald reporter was here this morning. There might be an article in tomorrow's newspaper. If there is, I would just instruct you not to read it, and I'll ask—if it is in the paper, I will ask you tomorrow morning if you saw it and if you viewed it. I don't expect it to be on any other type of—any other type of media, but most important is that you don't utilize any outside research. The decision that you make in this case is going to be solely based on the testimony from the witnesses and the evidence that's been produced in the trial. So with that, we'll see you tomorrow.

Each day of trial, before the testimony commenced, the judge asked the jurors if they had heard or read anything about the trial from outside sources, and each day, no juror indicated having heard or read anything about the trial from any outside sources. At the conclusion of each day, before discharging the jurors, the judge cautioned the jurors not to do outside research or to read anything about the trial.

¶ 6. On August 22, 2014, following deliberations, the jury returned a verdict in favor of defendants, finding that the Labates had failed to prove the standard of care applicable to each defendant. See 12 V.S.A. § 1908(1) (requiring, in a medical-malpractice suit, that plaintiff prove "[t]he degree of knowledge or skill possessed or the degree of care ordinarily exercised by a reasonably skillful, careful, and prudent health care professional engaged in a similar practice under the same or similar circumstances whether or not within the state of Vermont"). Therefore, in accordance with the verdict form, the jury never considered whether any defendant had

deviated from the appropriate standard of care or whether any deviation was a proximate cause of any injury. See id. §§ 1908(2), (3).

¶ 7. During the trial, an article did appear in a local newspaper. In response to the article, RRMC sent an e-mail to two different e-mail groups,[3] one labeled "RRHS All RRMC Physicians," the other "RRHS All RRMC Staff (no physicians),"[4] which read:

> A special "Monday Update" given the article in today's Herald about a trial going on involving [RRMC]. The suit is over the outcome of an [sic] birth which occurred in 2007. At the end of the process the child ended up having cerebral palsy. As I can personally attest this truly is incredibly unfortunate.
>
> As we all know, we do high risk work at [RRMC] just like every other hospital. From time to time things go wrong. If we feel we are at fault, we will apologize, take corrective action and, if appropriate, reach a settlement with the other party. In this case we did not feel we did anything wrong. We did not feel the physician did anything wrong. Outside experts, our insurance company and our attorneys all concurred. In these cases we will allow the case to come to court and let a jury decide.
>
> We clearly believe in this case that something tragic happened and we feel terrible for the family. The world is not always fair. Bad things sometimes happen. It does not always mean someone is at fault.

---

[3] The trial court referred to the e-mail groups named as recipients in the e-mail as "listservs." The term "listserv" is apparently subject to a range of definitions, from being simply a "group in which the sender can send one email and it will reach a variety of people," see Idaho State Univ. Faculty Ass'n for the Pres. of the First Amendment v. Idaho State Univ., 857 F. Supp. 2d 1055, 1058 n.2 (D. Idaho 2012) (quotation omitted), to being an automated mailing list that allow users to subscribe to particular topics and can be either managed automatically or by a human moderator, see Barrett v. Catacombs Press, 44 F. Supp. 2d 717, 721 n.1 (E.D. Pa. 1999) (citation omitted). It is unclear from the record which, if either, of these definitions might apply to "RRHS All RRMC Physicians" and "RRHS All RRMC Staff (no physicians)," the only named recipients of the e-mail. As a matter of simplicity and to avoid confusion, we refer to these recipients simply as "e-mail groups."

[4] The record reveals nothing about these e-mail groups other than the name assigned to them, which is reflected in the e-mail header information. There is no information about who or what owns them, i.e., are they personally or institutionally maintained, how often they are updated, whether they are as all-inclusive as their naming convention suggests, the quantity of e-mail addresses contained within each, or even specifically what e-mail addresses are included.

4

There is no indication that any party was aware of this e-mail during the trial. The Labates first raised a concern about this e-mail about two weeks after the jury returned their verdict, as part of a motion for new trial filed on September 8, 2014.

¶ 8. The Labates' motion for a new trial references the e-mail under a section header labeled "Attorney Misconduct." This initial reference states, in relevant part, that "[a]ny potential for jury misconduct, confusion, or failure to follow instructions was increased by . . . an email sent by RRMC's CEO to all doctors, staff and employees during the trial stating that RRMC had done nothing wrong and that their insurance, consultants and counsel had all agreed." The motion points out that at least one juror worked for RRMC and that the "email was calculated to impact jurors' opinions by comments that are not evidence but imply that the evidence supports Defendants' case" and that the e-mail "essentially says that Plaintiffs do not have a meritorious case." The vast majority of the motion, however, concerns issues that are not the subject of this appeal.

¶ 9. After defendants filed their opposition to the motion, but before the court ruled on the motion, the Labates filed an amended motion for a new trial, moving the reference to the e-mail from the section entitled "Attorney Misconduct" to a section entitled "Improper Juror Influence." This amended motion again makes only the same very short reference to the e-mail as the original post-trial filing and argues the same point that the e-mail "essentially says that Plaintiffs do not have a meritorious case" and that "[t]he email was calculated to impact jurors' opinions by comments that are not evidence but imply that the evidence supports Defendants' case." A supplemental filing made in further support of the motion for a new trial does not even mention the e-mail.

¶ 10. The Labates, in their amended motion, as relates to the e-mail, asserted that "[a]t least one juror on the jury worked at the hospital as a security guard and thus would have received this email or at least overheard conversations about it at work." The Labates, however, never

5

produced any specific information that the juror ever actually saw the e-mail or heard any conversations about it. Nothing in the record indicates that the Labates, following the return of the jury verdict, made any attempt to discuss the e-mail with the juror following the end of the juror's term of service, obtain a court order granting permission to do so prior to the expiration of the term, or subpoena RRMC's e-mail group information to discern which members of the RRMC community received the e-mail, regardless of whether they read it. During the trial, the juror never acknowledged nor disclosed receipt of the e-mail or acknowledged that he read it, despite numerous specific inquiries by the trial judge to the jury panel regarding outside information concerning the trial.

¶ 11. On November 17, 2014, without holding a hearing on the motion, the court issued a written decision denying the Labates' amended motion for a new trial. The court noted that the evidence before it concerning the e-mail did not include any indication that the juror had knowledge of the e-mail—there was no evidence that he was attending work when the e-mail was circulating; was attending work or checking work e-mail during the trial; was part of one of the e-mail groups to whom the e-mail was sent; or was normally in contact with those who were part of the e-mail groups. Given that evidentiary record, the court found it was entirely speculative that the e-mail was ever sent to the juror or that he read it at any time during the trial.

¶ 12. Despite the court's findings about the lack of any actual knowledge that the juror may have had about the e-mail, the court denied the motion as it pertained to the content of the e-mail, finding that the e-mail "contains only that which the jury already knew: that [RRMC] was denying liability and that it had found experts and attorneys who agreed with its decision to do so." Whether the security guard in fact received this e-mail was irrelevant because the content was not disclosing any new information.

¶ 13. On appeal, the Labates assert that the court erred in: (1) concluding that the e-mail was incapable of influencing the jury's verdict, and (2) insisting that the Labates had the burden

of proving facts within RRMC's "peculiar" control while relieving RRMC of its obligation to reveal what it knew.

¶ 14. Whether an irregularity occurred is a question of fact for the trial court. See Losier v. Ravi, 362 S.W.3d 639, 647 (Tex. App. 2009). "[T]he test is not whether the irregularity *actually* influenced the result, but whether it had the *capability* of prejudicing the verdict." Bellows Falls Vill. Corp. v. State Highway Bd., 123 Vt. 408, 414, 190 A.2d 695, 699 (1963) (emphasis added).

¶ 15. The Labates urge this Court to apply the test and burdens of proof for establishing juror misconduct utilized in criminal cases:

> Once a defendant sets forth sufficient evidence that an irregularity occurred and that it had the requisite capacity to affect the verdict, the State bears the burden of demonstrating that the irregularity did not actually prejudice the jurors against defendant, generally but not exclusively by demonstrating that the error was harmless beyond a reasonable doubt.

State v. Mead, 2012 VT 36, ¶ 13, 192 Vt. 1, 54 A.3d 485. "This protection flows from the Sixth Amendment guarantee that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." Id. ¶ 12 (quotation omitted). In contrast, "[t]he right to trial by jury in civil cases is guaranteed by the Vermont Constitution, Chapter I, Article 12, and the United States Constitution, Seventh Amendment." Harrington v. Decker, 134 Vt. 259, 261, 356 A.2d 511, 512 (1976) (per curiam). When it comes to juror misconduct in the civil context, we have not yet had occasion to address the allocation of the burden of proof, and we find it unnecessary to do so here as our resolution of the issues on appeal does not turn on who had the burden to establish capability of prejudicing the verdict. Cf. Markee v. Biasetti, 575 N.E.2d 1083, 1085-86 (Mass. 1991) (Wilkins, J., concurring) (arguing that majority's adoption of criminal allocation of burden of proof in civil context is inappropriate, but

nonetheless concurring with the decision because "[t]he difference in the placing of the burden concerning prejudice makes no difference in the conclusion the court and I reach" because jury "went so far beyond their proper role . . . that the likely prejudice to the plaintiffs is established as a matter of law"). For this reason, we find the Labates' reference to the United States Supreme Court decision in Mattox v. United States, 146 U.S. 140, 150 (1892) for the proposition that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear" to be unavailing.

¶ 16. We note, however, that the states that have addressed the issue of burden of proof in the civil context have not reached a unanimous conclusion on the proper allocations—some states place the burden on the moving party to establish prejudice, see, e.g., D.B. & J. Holden Farms Ltd. P'Ship v. Ark. State Highway Comm'n, 218 S.W.3d 355, 357 (Ark. Ct. App. 2005) ("Following allegations of juror misconduct, the moving party bears the burden of proving that a reasonable possibility of prejudice resulted from any such juror misconduct."), while others place the burden on the nonmoving party to establish no reasonable likelihood of prejudice, see, e.g., Markee, 575 N.E.2d at 1085 (finding "no reason to depart from reasoning" underlying burden-shifting scheme for establishing juror misconduct in a criminal case for civil cases, and thus holding that once moving party establishes that jury was exposed to outside influence, "the burden shifts to the nonmoving party to demonstrate that there is no reasonable likelihood that the party was prejudiced by what occurred"). See also Cooch v. S & D River Island, LLC, 85 A.3d 888, 898-902 (Md. 2014) (providing very detailed and thorough historical analysis of development of law in Maryland underlying motions for new trials in context of juror misconduct and recognizing that establishing proof of prejudice in civil context is separate and distinct from establishing prejudice in criminal context); Fitzpatrick v. Allen, 575 N.E.2d 750, 797 (Mass. 1991) (Abrams, J., concurring) (citing cases from various jurisdictions and indicating preference

8

for rule that "the moving party show that he was prejudiced by the extraneous material before the jury" but recognizing observation from Markee, 575 N.E.2d at 1085 that "place[s] the burden on the nonmoving party to demonstrate that there was no reasonable likelihood that the jury were influenced by the extraneous material").

¶ 17.    In this case, the trial court suggested there was insufficient proof an irregularity had occurred but nevertheless concluded that even if it had, the content of the e-mail was such that it could not have affected the verdict.  Whether alleged juror misconduct has prejudiced the trial process is a matter for the discretion of the trial judge.  See, e.g., D.B. & J Holden Farms, 218 S.W.3d at 357 ("Whether prejudice occurred is . . . a matter for the sound discretion of the trial court."); Smith v. State, 432 N.E.2d 1363, 1367 (Ind. 1982) ("It is well settled that juror misconduct is in the first instance a question for the trial court and the decision to grant or deny a mistrial is a matter committed to the trial court's discretion, reviewable solely on the issue of abuse of discretion.").  Our review is, therefore, to determine whether the trial court has abused its discretion.  See Bellows Falls, 123 Vt. at 414, 190 A.2d at 699 (finding no abuse of discretion in trial court's granting motion for new trial where jurors had received information outside of trial); see also State v. Savo, 141 Vt. 203, 208, 446 A.2d 786, 789 (1982) (explaining that discretionary rulings will be upheld "if there is a reasonable basis for the court's action" and that error will be found only where the court either failed to exercise its discretion or "exercised it for reasons clearly untenable or to an extent clearly unreasonable").

¶ 18.    Vermont Rule of Evidence 606(b) follows the long-established Vermont practice of protecting the jury's deliberative process from disclosure while still allowing juror testimony on whether improper information had been presented to the jury.  See Reporter's Notes, V.R.E. 606 (explaining that Vermont case law and Rule 606 recognize distinction "between the facts of outside influence or information and their effect"); Bellows Falls, 123 Vt. at 411-12, 190 A.2d at 697-98 (recognizing that "[t]he expressions of the jurors, their arguments and motives, their fears

9

and hopes, the individual juryman's state of mind are communicated with confidence that they will be kept secret beyond the jury room" and that "[t]he preservation of this confidence is vital to the constitutional function of the jury system, and is entitled to cautious protection" but that "misbehavior, even though it may have been the subject of comment among the jurors, is not entitled to the privileged secrecy of the jury room"). Rule 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in conjunction therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, (3) whether there was a mistake in entering the verdict onto the verdict form, or (4) whether any juror discussed matters pertaining to the trial with persons other than fellow jurors. A juror's affidavit or evidence of any statement made by the juror may not be received on a matter about which the juror would be precluded from testifying.

Thus, courts will not consider attempts through the jurors themselves to establish misconduct occurring during the jury deliberations concerning the mental processes or arguments of jurors. Jurors may, however, properly testify in response to inquiries as to whether extraneous prejudicial information was brought before them. See id.; Bellows Falls, 123 Vt. at 411-12, 190 A.2d at 697-98.

¶ 19. Here, the claim of juror misconduct involves the potential consideration of extraneous information, and inquiry of jurors themselves would be proper under V.R.E. 606(b) to the point of determining whether such information had been brought before the jury. The impact of such information on the jury deliberations, however, would not be a proper area of inquiry into, or testimony by, a juror as that would invade the jury's deliberative process. If misconduct were established, the impact of the consideration of that information, and its effect on a fair trial, would be solely for the trial court's determination.

10

¶ 20.    Accordingly, the trial court here was partially incorrect in its interpretation of the two-step process discussed in Bellows Falls and articulated in V.R.E. 606(b).  The trial court erroneously stated that evidence of whether outside influence occurred must be produced by "non-juror evidence."  As noted above, whether there has been an outside influence or whether extraneous prejudicial information has been brought before the jury are proper areas for which inquiry of the jurors is specifically allowed under our case law and Rule 606(b).[5] Notwithstanding that erroneous statement of the law, the trial court was correct that the second prong—whether the information had the capacity to affect the jury's verdict—is a matter upon which inquiry may not be made of the jurors.

¶ 21.    In a medical-malpractice action, the plaintiff bears the burden of proof to establish the appropriate standard of medical care and that a departure from that standard occurred. Senesac v. Assocs. in Obstetrics and Gynecology, 141 Vt. 310, 313, 449 A.2d 900, 902 (1982). The trial judge submitted this case to the jury using a verdict form with special interrogatories to be answered.  Contained within the interrogatories were questions asking if the jury found that the Labates had proven the appropriate standard of care to be used by RRMC and Cancio-Bello, both of which the jury answered in the negative.

---

[5]  Vermont Rule of Professional Conduct 3.5 expressly contemplates the idea that counsel may seek to communicate with jurors either before their term of service has been completed or thereafter.  If the juror's term of service has yet to be completed, counsel may not communicate with said juror "except by leave of court for good cause shown and under such terms as the court shall determine."  V.R.P.C. 3.5(b)(2); Reporter's Notes 2009 Amendment, V.R.P.C. 3.5(b)(2) ("A juror's term of service is concluded when that juror has been summoned for voir dire three times within a two-year period pursuant to Rules 6 and 9 of the Rules for Qualification, List, Selection and Summoning of All Jurors.").  If, on the other hand, the juror's term has been completed, counsel may seek to communicate with the juror unless such communication is prohibited by law or court order; the juror has made known that he or she does not wish to speak with counsel; or the communication "involves misrepresentation, coercion, duress, or harassment."  V.R.P.C. 3.5(c).  In this sense, counsel for the Labates was free to seek to communicate with any juror that counsel believed may have received the e-mail underlying this appeal, subject to the aforementioned limitations.  Had the jurors' terms of service not been up, counsel could have moved for leave of court for good cause shown to seek to speak with any juror regarding receipt of the e-mail.

¶ 22.   Even assuming, as the trial court did, that the e-mail at the heart of this appeal was ever read by the juror, it contained no discussion of the standard of care required of either defendant.[6]   A matter of dispute in the case was the standard of care required of a local hospital such as RRMC in response to a developing situation arising after normal-business hours.  Broadly construed, the e-mail asserted that RRMC "had done nothing wrong"—in other words, that they had met the applicable standard of care, whatever that may be.  Subsequent interrogatories to the jury requested that they determine if either defendant had deviated from the appropriate standard of care, a question not reached by the jury.[7]

¶ 23.   The Labates' failure to establish the requisite standard of care is quite a different matter than failing to establish that either defendant deviated from that standard.  Had the jury determined that the Labates had established the proper standard of care but that there had been no deviation from that standard, a potentially stronger argument might be made that the e-mail, if read, may have had an influence on at least one of the jurors.  The jury, however, never reached that question in their deliberations.  Because the e-mail contained nothing regarding the nature of the standard of care, it had no capacity to influence the jury on the questions on which they found a failure of proof, i.e., what constituted the standard of care in the first instance.

¶ 24.   The jury in this case was painstakingly reminded by the trial judge not to read anything from outside sources and to base its verdict solely on the evidence presented in court.  Additionally, they were questioned daily about whether they had received any outside

---

[6]  Because we assume arguendo that the e-mail was received and read by the juror, we need not and do not address the applicability of the "mailbox rule" to an e-mail.

[7]  When the jury initially returned its verdict, the foreperson had improperly filled out the verdict form indicating that Cancio-Bello had not deviated from the appropriate standard of care but had left the establishment of the standard of care question blank as to him.  The judge questioned the foreperson concerning this issue and gave the jury an opportunity to discuss its verdict further.  Upon its return, the foreperson indicated that he had made a mistake initially and had placed a check mark in the wrong question (question 5 instead of 4).  The revised verdict form indicated that the Labates had not established the appropriate standard of care as to either defendant and the response to question 5 was deleted.

information.  At every inquiry, the response was uniformly that they had not.  We cannot presume that the jury disregarded these instructions and inquiries from the trial judge.  In fact, quite to the contrary, the rule is that " 'juries are presumed to follow their instructions.' "  Zafiro v. United States, 506 U.S. 534, 540-41 (1993) (quoting Richardson v. Marsh, 481 U.S. 200, 211 (1987)).  Although not the basis for the court's denial of a new trial, the evidence in the existing record of whether an irregularity occurred at all was far from convincing and well short of the assumption that it was read by the juror as urged by the Labates.

¶ 25.   As noted, the argument raised below concerning the e-mail was extremely narrow, asserting only that the e-mail "was calculated to impact juror's opinions by comments that are not evidence but imply that the evidence supports Defendants' case."  On appeal to this Court, the Labates raise several new theories concerning the potential impact of the e-mail, including various claims under the Vermont Constitution that the e-mail impacted the right to an impartial jury and constructions of the e-mail as improperly introducing character evidence, none of which were raised in their arguments below.  This Court has long recognized that the trial court may not be put in error by an appellant advancing a theory on appeal that was not raised before the trial court.  See, e.g., Roberts v. Chimileski, 2003 VT 10, ¶ 14, 175 Vt. 480, 820 A.2d 995 ("As is so often the case, plaintiffs fully stated their new theory for the first time only in this Court, after their initial theory failed in the trial court.  Therefore, we find that plaintiffs failed to raise below and offer sufficient proof for their . . . [new] theory, and we will not address this issue here."); Robillard v. Tillotson, 118 Vt. 294, 302, 108 A.2d 524, 529 (1954) ("A question not raised below is not for consideration here.  Neither may a trial court be put in error on a point not made below."), abrogated on other grounds by Demag v. Better Power Equip., 2014 VT 78, 197 Vt. 176, 102 A.3d 1101.  The broad statement in the motion below concerning the e-mail did not put the trial court on notice of the arguments the Labates now make.  The trial court had no opportunity to

13

consider the various theories now advanced concerning the e-mail and therefore those theories are not properly before this Court and we shall not address them.

¶ 26.    Considering the e-mail in light of the arguments properly raised by the Labates, the trial court was correct that the e-mail did not have the capacity to affect the verdict.  The trial court was also correct that the e-mail's content was primarily a denial of any wrongdoing, a point squarely before the jury throughout the trial.  In addition, the jury's verdict—that the Labates had failed in establishing the applicable standards of care—had nothing to do with anything contained in the e-mail.  Although our prior case law has established a two-prong test in cases of alleged-juror misconduct or extraneous-outside information, it was not necessary for the trial court to determine whether the irregularity had occurred in this instance.  Even if the irregularity had occurred, the court's determination that it had no capacity to affect the verdict was not an abuse of discretion.

Affirmed.

FOR THE COURT:

_____
Associate Justice

14