## State of Vermont v. David Brunell

[615 A.2d 127]

No. 89-628

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed May 22, 1992

Motion for Reargument Denied July 9, 1992

*Jeffrey L. Amestoy*, Attorney General, and *Susan R. Harritt*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Michael Rose*, St. Albans, for Defendant-Appellant.

**Morse, J.** Defendant was convicted by a jury for the second-degree murder of his 20-month-old daughter. 13 V.S.A. § 2301. On appeal, he claims that plain error was committed when the trial court instructed the jury on second-degree murder and manslaughter. He also contends his conviction was based upon insufficient evidence. We affirm.

On May 31, 1986, the day of the child's death, defendant's wife—the child's mother—took her to a flea market. Although the child appeared unusually "whiny, fussy and clingy," she was otherwise alert, and the wife did not think that she was in need of medical attention at the time. The wife testified that she remembered seeing a bruise on the child's head and insect bites on her face.

After their return, the wife spent the rest of the day with the infant, feeding her and then putting her to bed. The wife and her sister went out again that evening, leaving the child at the couple's apartment in the care of defendant. Upon their return, they found defendant outside the apartment in his car with the child in the car seat, apparently unconscious. Defendant explained that "she just stopped breathing," and that he was anxious to get the child to the hospital. He later explained to his wife that he heard the child crying, went to the bedroom, shook

her "a little bit" to stop her crying, and that it did not work. He then put his hand over her mouth and it "took her breath away."

The wife performed C.P.R. to no avail, as did the emergency medical technicians called to the scene and the emergency staff at the hospital. The child was pronounced dead at 11:00 that evening.

At trial, the State called an upstairs neighbor, who testified that on the evening of the child's death she heard the child crying and defendant yelling. She heard defendant shout profanities at the child and for her to "shut up." She also heard banging and loud rumbling noises interspersed with the crying. She stated at no time did she hear the wife's voice.

The State called various medical experts on the cause of death. The emergency room physician testified that the child had apparently fresh bruises on her head, as well as red facial spots which could indicate, among other things, suffocation. The State also called the Deputy Chief Medical Examiner, who testified similarly as to suffocation, adding that the presence of other physical injuries, such as injuries to the brain and blunt trauma to the head, indicated either "shaken infant syndrome" or outside impact. These physical injuries could have accelerated the number of minutes it would otherwise have taken for the child to die by suffocation. The expert ruled out a childhood fall or play as the cause of the injuries, and instead attributed the cause of death to a combination of suffocation, shaken infant syndrome, and blunt trauma. The expert believed that the injuries were inflicted within twenty-four hours of death, and could have been inflicted as soon as four hours prior to death, depending on the actual cause of the head trauma. The State's third expert ruled out blunt trauma as a cause of death, concluding that the child died from suffocation and shaken infant syndrome.

The defense offered an expert specializing in pathology, who opined that the death was caused solely by blunt trauma to the head that had occurred earlier in the day, accounting for the child's irritability while on the outing. In this expert's opinion, the injuries indicated that the trauma was of a type that results from a fall.

Defendant's theory, argued to the jury, was that his child died from the effects of a fall, not by anything he did to her. The

court told the jury, "The defense is that the defendant did not kill [his child]."

The relevant instructions to the jury on second-degree murder were as follows:

> [Y]ou must find beyond a reasonable doubt that the defendant did an act or acts which directly caused the death of [the child]. . . . Secondly, the State must prove beyond a reasonable doubt that the defendant killed [the child] unlawfully and that means there existed no lawful justification for such a killing such as self-defense and third, the State must prove beyond a reasonable doubt that the defendant acted willfully and deliberately; that is, the defendant acted on purpose by design, not by accident or mistake. You must find that the defendant acted with a specific intent in mind to kill [the child]. . . . Fourth, the State must also prove beyond a reasonable doubt that the defendant acted with malice aforethought. Malice aforethought means an intent at the time of the killing to take the life of another human being, or acting in wanton disregard of the value of human life. Malice aforethought does not necessarily imply any specific ill will, spite, or hatred towards the person killed.

Later, in response to a question from the jury on the willful element and on malice, the court instructed the jurors that "willfully means intentionally or purposefully, and intentionally means with resolve to do a particular act." The court further defined malice as "a design to kill, or acting in a wanton disregard of life where there is no specific intent to kill. It is acting in a depraved or wicked manner. Malice may be somewhat similar to willful or deliberate, but malice implies a certain degree of *immorality*." (Emphasis added.)

The court went on to define manslaughter in its instructions should the jury not be able to return a guilty verdict on second-degree murder. First, instructions were given on *voluntary* manslaughter:

> The difference between second degree murder and voluntary manslaughter is malice aforethought. If you find beyond a reasonable doubt that the defendant killed [his child], and that he did so unlawfully, and that he did so willfully and deliberately, but you do not find or have a reason-

able doubt as to whether he acted with malice, then you may find the defendant guilty of voluntary manslaughter. Malice may be absent by reason of sudden passion.

And, in the event the jury were unable to find defendant guilty of that crime, the court next instructed on *involuntary* manslaughter:

The difference between the voluntary manslaughter and involuntary manslaughter is that in the offense of involuntary manslaughter, the defendant acts without willfulness and deliberateness. If you find beyond a reasonable doubt that the defendant killed [his child] and the death was caused by an unlawful act, such as using unreasonable force, but without an intent to take life, then you may find defendant guilty of involuntary manslaughter.

Defendant argues that these instructions (1) confused the requisite states of mind for second-degree murder (malice) and involuntary manslaughter (criminal negligence), (2) improperly included the word "immorality" to describe malice, and (3) insufficiently defined what constitutes awareness of the deadly risks in distinguishing involuntary manslaughter from second-degree murder.

The unchallenged instructions were given in substantial conformity to defendant's requests.* Defendant nevertheless

---

\* Defendant requested the court to instruct the jury that for defendant to be guilty of second-degree murder he must have killed his child unlawfully, willfully, and with malice. He requested that "willful" be defined as "intentional, as distinguished from accidental." He requested "malice" be defined as

the evil intent which gives rise to an unlawful act. In common speech it means ill will against a person, but in its legal sense it means a wrongful act done intentionally without just cause or excuse. It is an intention to kill, or an intention to do great bodily harm, or the wanton disregard of the likelihood that one's behavior may naturally cause death or great bodily harm. Malice may be indicated by evidence, if you so find, that the Defendant either (1) intentionally set in motion a chain of events which a reasonable person knew or should know was likely to cause death or great bodily injury, or (2) acted with extreme indifference to human life.

As for manslaughter, defendant requested the following instructions:

In the absence of malice, a homicide cannot be an offense higher than manslaughter. Therefore, if you find that the death was willfully caused by the Defendant, but that the State has failed to prove beyond a reasonable

claims reversal is required under the plain error doctrine. Although we agree the challenged charge could have been clearer, we cannot conclude that it constituted plain error.

■ Analyzing defendant's first argument that the court's description of the requisite states of mind for the various types of homicide was so confused as to require reversal, we are persuaded that any deficiencies in the charge did not amount to plain error.

The court defined the third, or willful, element of second-degree murder as "a specific intent in mind to kill" and the fourth, or malice, element as either intent to kill or "wanton disregard [for] the value of human life." Confusion over these concepts may have derived from our case law where in dictum the terms "malice" and "willful" are overlapped. Compare *In re Dunham*, 144 Vt. 444, 448, 479 A.2d 144, 146 (1984) ("murder, whether first or second degree, requires an intent to kill, and the 'wilful' element of 13 V.S.A. § 2301 denotes that intent"), with *State v. Doucette*, 143 Vt. 573, 582, 470 A.2d 676, 682 (1983) ("malice" element of murder denotes an "intention to kill").

Although confusion may occur when courts define the concept of "malice" as an element intertwined with another element, in this case, the charge on the elements of second-degree murder is not cause for reversal. Given the defense theory that the child died as a result of an injury inflicted, not by defendant, but by a fall the day before death, any shortcomings in the instructions on defendant's mental state were less significant. See *State v. Wright*, 154 Vt. 512, 520–21, 581 A.2d 720, 726 (1989) (no plain error where error not obvious and did not have significant impact on defense theory of innocence). Further, the challenged language was only part of a charge which emphasized that, in addition to malice aforethought, the State must prove beyond a

doubt that Defendant acted with malice, then the Defendant is guilty of manslaughter and nothing more.

Absence of malice, and hence voluntary manslaughter, is further defined as the intentional and unlawful killing of a human being with a real design and purpose to kill, but as a result of sudden passion or great provocation, and done before adequate time for cool reflection.

A killing may also be involuntary [sic] manslaughter if the Defendant did not, at the time, have the mental capacity necessary to act with legal malice, in legal terms he is said to have "diminished capacity."

reasonable doubt that defendant acted "wilfully and deliberately . . . by design, not by accident or mistake." Considering the charge in its entirety, we cannot say that it adversely affected defendant's substantial rights. *State v. Roy*, 151 Vt. 17, 24, 557 A.2d 884, 889 (1989).

■ Nor do we find the court's use of the word "immorality" to have had any significant impact on the instructions. Defendant has isolated one word out of the entire charge in claiming that the court invited the jury to convict on the basis that he was an immoral person. By taking this word out of context, defendant gives it undue emphasis. Taken as a whole, we do not conclude that the instructions were so misleading as to amount to plain error. See *State v. Valley*, 153 Vt. 380, 398, 571 A.2d 579, 588 (1989).

Defendant also argues that the phrase "wanton disregard of the value of human life" in the second-degree murder instruction was too vague to adequately explain that the jury must find that defendant *actually* appreciated the gravity of the risk of his actions to the child's well-being, and that this instruction was insufficient to distinguish between murder and manslaughter. He claims the jury could have viewed wanton disregard as criminal negligence, the state of mind permitting conviction of involuntary manslaughter only. He further argues that the evidence on his state of mind was insufficient to convict him of second-degree murder. Based on the testimony of the expert for the defense, defendant contends that he could have been unaware of the danger caused by shaking the child, and that "this was not a case in which the cause of death was an agent commonly known to be deadly."

■■ The difference between the implied intent to kill ("depraved heart") required for second-degree murder, and the criminally negligent conduct for involuntary manslaughter, is the defendant's awareness of the risk and the degree of that risk. To be convicted of second-degree murder, the defendant must subjectively be aware of the deadly risk to the victim. See *People v. Dellinger*, 49 Cal. 3d 1212, 1217, 783 P.2d 200, 202–03, 264 Cal. Rptr. 841, 844 (1989) (defendant's conviction of second-degree murder based on implied malice required a finding that he "'*actually appreciated* the risk [to human life] involved, i.e.,

a *subjective* standard'") (quoting *People v. Watson*, 30 Cal. 3d 290, 296–97, 637 P.2d 279, 283, 179 Cal. Rptr. 43, 47 (1981) (emphasis in original)); *State v. Fontana*, 680 P.2d 1042, 1047 (Utah 1984) (second-degree murder conviction under "depraved indifference" provision of criminal code required State to prove that the defendant knew that his conduct created grave risk of death to another). On the other hand, defendant need not be actually aware of the risk to the victim to be guilty of involuntary manslaughter. *State v. Stanislaw*, 153 Vt. 517, 525, 573 A.2d 286, 291 (1990). The test is an objective one, focusing on what a reasonable person would appreciate the risk to be under all the facts and circumstances. *Id.*

█ █  In addition, for second-degree murder, the extent of risk must be something more than that required for criminal negligence. The actual risk required for criminal negligence is greater than the negligence standard of care in a civil case. *State v. Beayon*, 158 Vt. 133, 135, 605 A.2d 527, 528 (1992); *Stanislaw*, 153 Vt. at 525, 573 A.2d at 291. For second-degree murder, however, "the degree of risk of death or serious bodily injury must be more than a mere unreasonable risk, more even than a high degree of risk." 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.4, at 200 (1986); see *State v. Dunbar*, 117 Wash. 2d 587, 594, 817 P.2d 1360, 1363 (1991) ("depraved mind" murder requires an "extreme form of recklessness which sets the crime apart from first degree manslaughter"); cf. *State v. Crocker*, 435 A.2d 58, 67 (Me. 1981) (although depraved-indifference murder and criminal negligence both have an objective mental element, the former is distinguished by requiring a very high degree of risk that death will result).

We again must employ plain-error analysis to evaluate defendant's attack on the sufficiency of defining the mental element required for murder in the second degree and involuntary manslaughter. We believe that a reasonable juror would understand the charge to mean that one must actually appreciate the risk to human life in order to disregard it.

█  As for the sufficiency of the evidence, the jury could reasonably have found that defendant was aware of the deadly risk of shaking and covering the mouth of a 20-month-old infant. Defendant admitted this conduct to his wife, who related his

statements to the jury. The State introduced expert and medical testimony on the victim's injuries that confirmed the conduct.

Defendant's reliance on the lack of "an agent commonly known to be deadly" is not persuasive. The absence of a deadly weapon in the traditional sense does not necessarily preclude an awareness of deadly risk. See *United States v. Eder*, 836 F.2d 1145, 1148–49 (8th Cir. 1988) (evidence supported defendant's second-degree murder conviction of his three-year-old daughter where the defendant's conduct was so "reckless and wanton" that the jury could infer he was aware of the serious risk of death); *Bishop v. People*, 165 Colo. 423, 430, 439 P.2d 342, 346 (1968) (intent to kill can be implied where "an assault with the hands . . . is committed on an infant of tender years"); 2 LaFave & Scott, *supra*, § 7.2, at 195 (inference of intent to kill may properly be drawn in cases where children are attacked solely with hands). Therefore, we see no merit in defendant's argument that his failure to use a "deadly weapon" reduced his ability to perceive the risk of death to the infant. Given the circumstances, the jury had enough evidence before it to conclude that the danger to the victim was readily apparent.

*Affirmed.*