NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 78

No. 2016-190

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Caledonia Unit, |
| | Criminal Division |
| | |
| Keith J. Baird | November Term, 2016 |

Michael S. Kupersmith, J. (Ret.), Specially Assigned

Lisa A. Warren, Caledonia County State's Attorney, St. Johnsbury, for Plaintiff-Appellant.

Allison N. Fulcher of Martin & Associates, Barre, for Defendant-Appellee.

PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.    **EATON, J.**    The State charged Keith Baird, defendant in this appeal, and two others with burglary, kidnapping, and first-degree murder for their involvement in the death of seventy-eight-year-old Mary O'Hagan on September 10, 2010 at her home in Sheffield, Vermont. The basis for defendant's murder charge was that the murder occurred during the commission of a burglary in which defendant participated and therefore constituted felony murder pursuant to 13 V.S.A. § 2301.  Defendant filed a Vermont Rule of Criminal Procedure Rule 12(d) motion to dismiss the first-degree murder charge, arguing that the State could not establish a prima facie case because it could not show that defendant killed the victim or that he had the necessary mental state for first-degree felony murder.  A deposition of Richard Fletcher, one of the codefendants, provided most of the admissible evidence in support of the State's opposition to the motion to

dismiss; facts in the investigating police officer's affidavit of which he had first-hand knowledge provided additional support for the State's opposition. Following a hearing, the court granted defendant's motion to dismiss. For the reasons stated herein, we reverse the dismissal, reinstate the first-degree murder charge, and remand for further proceedings.

¶ 2. When reviewing the grant of a Rule 12(d) motion to dismiss, this Court employs the same standard as the trial court. State v. Willard-Freckleton, 2007 VT 67A, ¶ 2, 183 Vt. 26, 949 A.2d 416. A motion to dismiss must be denied if, " 'taking the evidence in the light most favorable to the state and excluding modifying evidence, the state has [produced] evidence fairly and reasonably tending to show the defendant guilty beyond a reasonable doubt.' " State v. Fanger, 164 Vt. 48, 51, 665 A.2d 36, 37 (1995) (quoting Reporter's Notes, V.R.Cr.P. 29). Because the grant of a motion to dismiss precludes a jury from hearing any evidence and because a jury is in the best position to weigh facts and deliver a verdict, "courts should grant a judgment of acquittal only when there is no evidence to support a guilty verdict." State v. Cameron, 2016 VT 134, ¶ 5, __ Vt. __, __ A.3d __. Thus, the issue before the trial court, and before this Court on appeal, is whether the State produced sufficient "substantial, admissible evidence" to prove beyond a reasonable doubt that defendant had the requisite mens rea for felony murder. V.R.Cr.P 12(d)(2); see also Cameron, 2016 VT 134, ¶ 5.

¶ 3. At common law, the felony-murder doctrine imputed an intent to murder when a death occurred during the perpetration of a felony, even if the death was an accident or otherwise unintentional. State v. Bacon, 163 Vt. 279, 291, 658 A.2d 54, 62-63 (1995) (citing 2 W. LaFave & A. Scott, Substantive Criminal Law § 6.7, at 145, § 6.8, at 159 (1986)). The doctrine applied not only to the felon who caused the death but also to all accomplices in the underlying felony. Id.; see also Tison v. Arizona, 481 U.S. 137, 159 (1987) (Brennan, J., dissenting) ("This curious doctrine is a living fossil from a legal era in which all felonies were punishable by death; in those circumstances, the state of mind of the felon with respect to the murder was understandably

2

superfluous, because he or she could be executed simply for intentionally committing the felony." (footnote omitted)). As we observed in State v. Doucette, however, "[a]s the common law developed, many more crimes became felonies, and many of these, such as tax evasion, larceny, and embezzlement, were not violent and did not involve a likelihood of causing death." 143 Vt. 573, 578, 470 A.2d 676, 680 (1983)). Thus, this Court has interpreted the rule narrowly "to mitigate the harshness of the common-law felony-murder rule." Bacon, 163 Vt. at 292, 658 A.2d at 63; see also Doucette, 143 Vt. at 581, 470 A.2d at 682 (reasoning that Legislature intended to "limit the common law felony murder rule in order to restrict its harshness").

¶ 4. In Vermont, the applicable statute, 13 V.S.A. § 2301, precludes prosecution for first-degree murder based solely on evidence that a defendant intended to commit one of the enumerated felonies.[1] See Bacon, 163 Vt. at 291, 658 A.2d at 63 (holding that "the mere showing that a person intended to commit one of the felonies enumerated in § 2301 is insufficient to convict the person of felony murder"); Doucette, 143 Vt. at 582, 470 A.2d at 682 (same). In addition to proving the defendant's intent to commit one of the enumerated felonies, the State must also establish that the defendant had one of the mental states for second-degree murder: the intent to kill, the intent to do great bodily harm, or "a wanton disregard for human life with respect to the murder itself." Bacon, 163 Vt. at 292, 658 A.2d at 63; see also State v. Sexton, 2006 VT 55, ¶ 17, 180 Vt. 34, 904 A.2d 1092 overruled on other grounds by State v. Congress, 2014 VT 129, 198 Vt. 241, 114 A.3d 1128. The theory behind Vermont's limitation is that the State must prove the individual liability of each felon because it " 'is fundamentally unfair and in violation of basic principles of individual criminal culpability to hold one felon liable for the unforeseen and unagreed-to results of another felon.' " Bacon, 163 Vt. at 292, 658 A.2d at 63 (quoting People v. Aaron, N.W.2d 304, 372 (Mich. 1980)). Requiring the State to prove, at a minimum, wanton

---

[1] The enumerated felonies are "perpetrating or attempting to perpetrate arson, sexual assault, aggravated sexual assault, robbery[, and] burglary." 13 V.S.A. § 2301.

disregard for human life in a first-degree felony-murder prosecution is also consistent with the U.S. Supreme Court's recognition that

> some nonintentional murderers may be among the most dangerous and inhumane of all—the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill."

Tison, 481 U.S. at 157.

¶ 5. Thus, in Vermont, so long as the State establishes that a defendant had the requisite mental state for a second-degree murder conviction, any "murder" committed during the perpetration of an enumerated felony constitutes first-degree murder, regardless of whether the defendant caused the killing. Bacon, 163 Vt. at 291, 658 A.2d at 63. If the State proves that a defendant had the intent to commit an enumerated felony, that a murder occurred during the commission of that felony, and that the defendant had, at minimum, a wanton disregard for human life, 13 V.S.A. § 2301 makes the defendant guilty of murder in the first degree, even though he or she might otherwise have been guilty only of murder in the second degree. See Sexton, 2006 VT 55, ¶ 17 (describing mens rea requirements for second-degree murder). In this case, the application of the felony-murder rule to defendant does not require that the State put forth evidence that he murdered the victim; the issue here is whether the State put forth sufficient substantial, admissible evidence to prove beyond a reasonable doubt that Baird had, at minimum, a wanton disregard for human life during the victim's killing. See V.R.Cr.P. 12(d)(2); see also Fanger, 164 Vt. at 51-52, 665 A.2d at 37. The other elements the State must prove to convict defendant of first-degree murder are not the subject of the motion to dismiss.

¶ 6. In finding the evidence of intent lacking, the trial court stated "there is no evidence that the defendants intended to harm [the victim] in any way." The court went on to state "there

4

was no evidence from which the jury might reasonably infer that [] Defendant knew of the probability or likelihood that his conduct or the conduct of his co-defendants would naturally cause death or great bodily harm to [the victim]." We disagree.

¶ 7.    The State's evidence, taken in the light most favorable to it, shows that on the afternoon of September 10, 2010, Richard Fletcher, defendant—Fletcher's half-brother—and Fletcher's cousin, Michael Norrie, met at a vacant property near the victim's house to get high on methamphetamine and devise a plan to commit a burglary. The initial idea to commit a burglary was defendant's. All three codefendants had consumed drugs that day and they consumed more drugs while formulating their plan.

¶ 8.    The three men were acquaintances of the victim's and had worked for her in the past, and knowing that she kept a key to her front door under the doormat on the porch, the men devised a plan to burglarize her house. Plans concerning what was to happen during the commission of the burglary were unclear other than that the men would search for money and pills, which they believed they would find because they knew the victim was elderly. They expected her to be home and originally intended to wait until 12:20-1:30 a.m. before breaking in so that she would be asleep when they entered. The plan was for Norrie and defendant to enter through the front door using the key that they knew the victim kept under the doormat. Fletcher was to "take" the back door.

¶ 9.    Defendant raised the idea of bringing guns to the burglary and the others agreed. According to Fletcher, the plan was for the guns to be unloaded, except for the one he was bringing, and no one was to get hurt. Fletcher told his two coconspirators that their guns should be unloaded because they were more impaired by the drugs they had consumed than he was, but he assumed the guns were unloaded and did not check them. After devising this plan, the three men went to their respective homes to retrieve guns and other things they felt they needed during the burglary. Norrie and defendant got .22 caliber handguns and Fletcher got ammunition for the shotgun that

5

he carried in his truck. Fletcher also got gloves and a mask, and Norrie and defendant got gloves but did not bring masks with which to cover their faces. The three men met back at the vacant property and "got high again."

¶ 10. According to Fletcher, defendant and Norrie were impatient and decided to enter the victim's house at about midnight, half an hour earlier than they had planned. Using the victim's key, Norrie and defendant entered the front door armed with handguns and wearing gloves but without masks to conceal their identities. Fletcher went toward the back door. He was wearing gloves and a mask. As he approached the rear of the house, Fletcher saw that the victim was still awake and was watching television, but it was too late for him to alert the others because defendant and Norrie had already entered the house. Norrie and defendant entered the house through the front door, and defendant then let Fletcher into the house through the rear door. Fletcher did not bring his shotgun into the house. Upon entering the kitchen, Fletcher saw that Norrie had the victim on her knees in front of him and that he had a handgun pointed at the back of her head. While they were all in the kitchen, the three men agreed to search the home.

¶ 11. Norrie remained in the kitchen guarding the victim while defendant went upstairs to search and Fletcher searched downstairs rooms. During his search, Fletcher heard the victim say something to the effect of "take what you want and get out." About a minute later, Fletcher heard a gunshot followed about ten or twenty seconds later by a second gunshot. Defendant was still upstairs when Fletcher heard the gunshots. Fletcher returned to the kitchen and saw the victim lying face down on the floor with a wound to the back of her head. Norrie was standing over her with his handgun still smoking. The victim appeared to Fletcher to be dead.

¶ 12. Fletcher stated that he was upset with Norrie for killing the victim and that he retrieved his shotgun from outside and got into a struggle with Norrie, resulting in the shotgun discharging into the kitchen ceiling. Defendant got Fletcher to give him the shotgun and no further

6

shots were discharged. Following this dispute, the three then cleaned up the crime scene. Fletcher and defendant later hid the victim's body at a location in Wheelock where it was eventually found.

¶ 13. The question that was before the trial court and that is before this Court on appeal is whether, on the basis of those facts, a reasonable factfinder could conclude that defendant had at least the mental state of wantonness. See Fanger, 164 Vt. at 51-52, 665 A.2d at 37. Wantonness is defined as "extremely reckless conduct that disregards the probable consequences of taking human life." State v. Shabazz, 169 Vt. 448, 455, 739 A.2d 666, 670 (1999). To be convicted of second-degree murder based upon wanton conduct, there must be evidence that the defendant was aware of the deadly risk posed to human life from his or her actions. See State v. Brunell, 159 Vt. 1, 7-8, 615 A.2d 127, 130-31 (1992). However, the State need not prove a defendant's mental state directly because we have long recognized that direct evidence of intent is rare; "it must be inferred from a person's acts and proved by circumstantial evidence." See State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988).

¶ 14. Here, it is undisputed that defendant and Norrie brought not one but two guns into the victim's house during the robbery, and Fletcher left another, admittedly loaded gun, outside. Defendant and Norrie specifically went home to retrieve their handguns after formulating the burglary plan. We have recognized that, as a matter of law, a gun used in a robbery, whether loaded or not, is a dangerous weapon because "[i]t is the potentiality of its use to effectuate the implied threat of injury or death that makes any weapon dangerous." State v. Parker, 139 Vt. 179, 183, 423 A.2d 851, 853 (1980).

¶ 15. Even if we were to accept the argument that defendant did not know that his codefendants' guns were loaded, that claim is insufficient, in the context of a Rule 12(d) motion, to negate a finding of wantonness. The very purpose of being armed, and of brandishing weapons, is to convey to the intended victim the belief that the guns are loaded and that serious and potentially deadly harm will result unless the victim complies. The victim has no way to know

7

whether any weapon is loaded but certainly must believe that it is, consistent with the representation being made by the perpetrator. The introduction of weapons during the commission of a crime is a significant escalation of dangerousness, even if some or all the perpetrators believe the guns are unloaded. The only purpose in bringing a firearm to the commission of a robbery is to use it or to threaten to use it. Such an escalation increases the danger to human life. Commonwealth v. Carter, 484 N.E.2d 1340, 1342 (Mass. 1985). As the Carter court noted, "[t]he use of a gun, even if it is unloaded, may provoke violent resistance from the intended victim" or result in other deadly consequences. Id. Many people have weapons in their homes and could easily respond violently to the threat posed by an armed burglary. In addition, a gun that one coconspirator believes to be unloaded may in fact be loaded—regardless of the coconspirators' expectations—as was the case here. Such a gun may come to cause death, as it did to the victim here. Also, a gun may be used as a bludgeon even if it is not loaded. See Parker, 139 Vt. at 183, 423 A2d at 853.

¶ 16.    Here, moreover, the admissible statements from Fletcher's deposition, taken in the light most favorable to the State, show that all three men knew that Fletcher was bringing ammunition for his shotgun to the burglary. There was no need to have any ammunition if the only purpose was to scare the victim. The decision to bring ammunition for at least one of the guns, as all three men knew to be the case, was to provide the ability to use the gun if necessary. Further, that all three men brought guns with them after their significant drug use heightened the probability of injury or death. The use of one or more guns in the commission of the burglary, loaded or not, is sufficient evidence to survive a Rule 12(d) motion to dismiss on the issue of defendant's mental state.

¶ 17.    Contrary to the dissent's assertions, evidence of defendant's wantonness is not confined to the decision to use firearms in the commission of a burglary. Defendant and his coconspirators knew the victim to be elderly and targeted her home with that in mind. After

8

entering her home and while Norrie had the victim on the floor in an execution position, the three men agreed to search her home. Defendant, who was then with the other two men, was or should have been aware of the peril facing the victim. Since they all knew each other, and since he and Norrie were not wearing masks, defendant was also aware that the victim had had an opportunity to recognize him and Norrie. Despite this life-threatening situation, defendant did nothing to de-escalate the risk of harm to the victim and instead left the room to ransack the second floor of the house, leaving the victim on her knees at gunpoint.

¶ 18. Additionally, all three men were aware that the victim knew them and could identify them if she saw them. Significantly, they expected that she would be home the night of the burglary, which was why they initially intended to delay entry until she would likely be asleep. Despite their awareness that the victim could identify them, and knowing that she was home, defendant and Norrie wore nothing to conceal their identity, risking the chance of identification. That the three men entered the home through two different doors, coupled with Fletcher's statement that he would "take" the back door, could also be viewed as a way to prevent the victim from successfully fleeing as might be the case if entry was made by all three burglars through the front door. These additional facts further contribute to the wantonness of defendant's actions. The evidence of wantonness was sufficient for the question of defendant's mental state to survive a Rule 12(d) motion to dismiss. Because the State produced sufficient evidence that fairly and reasonably tended to show the defendant guilty beyond a reasonable doubt, see State v. Free, 170 Vt. 605, 605-06, 749 A.2d 622, 623 (2000) (mem.), the motion to dismiss should have been denied.

The dismissal of the murder charge is reversed, the charge is reinstated and the case remanded for further proceedings.

FOR THE COURT:

_____

Associate Justice

9

¶ 19.  **DOOLEY, J., dissenting.**  Even without the charge involved in this appeal, defendant in this case is charged with very serious crimes and, if convicted, is likely to face a very heavy incarcerative sentence.  It is not even clear that the sentence would be longer if defendant is convicted of the charge that the majority has reinstated.  Thus, this dissent is not prompted by this defendant's circumstances.  Instead, my concern is that the Court is stretching the requirements for accomplice liability beyond the clearly established and settled limits, and in future cases, will sweep in persons whose conduct does not warrant the consequences that defendant in this case faces.  For this reason, I dissent.

¶ 20.  Accomplice liability is meant to punish defendants, who intend to, and in fact do, aid in the commission of the charged offense by the primary perpetrator.  To support the felony-murder charge in this case, the State must prove that defendant acted with the same intent as required for his accomplice who committed the murder—that he intended to kill or at least knew his actions would cause great bodily harm or death.  The facts simply do not support this mental element requirement.  Defendant agreed to rob the victim, but did not agree that she be harmed and, consistent with his agreement with respect to the victim, understood that any guns present during the robbery were not to be loaded.  Further, defendant did not actually harm the victim and was not present when she was killed.  Given these uncontested facts, the State has failed to provide evidence sufficient to demonstrate beyond a reasonable doubt that defendant had the requisite intent.

¶ 21.  Felony murder in Vermont requires a showing of intent to commit the felony and to kill.  "The mere fact that a defendant's conduct makes him an accomplice to the commission of the underlying felony does not necessarily show that he is also an accomplice to the felony murder."  State v. Bacon, 163 Vt. 279, 292, 658 A.2d 54, 63 (1995).  To convict defendant of being an accomplice to felony murder, the State must demonstrate that defendant had both the intent to

10

commit the felony and the mental state required for felony murder—at a minimum, an extreme indifference to the value of human life. Id. Further, accomplice liability cannot be used to convict a participant to a crime "who never intended a co-felon to commit the acts in fact committed." Id. at 290, 658 A.2d at 62. Therefore, in response to the motion to dismiss, the State was required to demonstrate "substantial, admissible evidence" to "fairly and reasonably" show, V.R.Cr.P. 12(d)(1), 29(a), that defendant acted at least with a "wanton disregard of the likelihood that death or great bodily harm would result." Id. at 291, 658 A.2d at 63.

¶ 22. The facts presented were as follows. Defendant and two other individuals agreed to burglarize a home. The plan was to obtain money and pills, but not to harm the victim. They waited until late when the victim would be asleep. They agreed to bring guns, but not to have them loaded. They knew where a key was located so they could enter silently. They wore gloves, and one accomplice wore a mask. When defendant entered the home, he did not know the victim was awake or that one of his accomplices had a loaded gun in violation of their agreement. Defendant entered the kitchen and observed that one accomplice had the victim on her knees and was holding a gun to her head, but at the time he believed the gun was not loaded. Defendant went upstairs to search and was not present when the victim was shot. After the victim was shot, the three cleaned up the crime scene, removed the body, and hid the body in the woods.

¶ 23. Viewing the evidence in the light most favorable to the State, the jury may have inferred that defendant intended to commit the underlying burglary, a felony, and was present in the home when the victim was shot, but the evidence does not fairly and reasonably show beyond a reasonable doubt that defendant acted with an intent to take the victim's life or in wanton disregard for the victim's life. See State v. Millette, 173 Vt. 596, 596, 795 A.2d 1182, 1183 (2002) (mem.) (stating that, in assessing motion to dismiss, question is "whether the evidence, taken in the light most favorable to the State, excluding modifying evidence, would fairly and reasonably tend to show defendant committed the offense, beyond a reasonable doubt"). The evidence does

11

not support the inference that defendant intended for the victim to be hurt, let alone killed. One codefendant explicitly testified that the intent was for the victim not to be harmed. In addition, the circumstantial evidence does not support an inference that defendant intended harm or should have reasonably expected that his actions would result in severe injury or death. See State v. Fanger, 164 Vt. 48, 53, 665 A.2d 36, 38 (1995) (explaining that because intent "is rarely proved by direct evidence," defendant's intent is shown based on circumstantial evidence (quotation omitted)). First, he agreed to enter the home with a key at a time when the victim would be asleep, indicating that the plan was not to have any contact with the victim. He agreed to take unloaded guns, and no other weapons, indicating a desire not to cause severe injury or death. And, defendant wore gloves, but no mask,[2] indicating that he did not want to leave fingerprints for detection from the robbery, but did not plan on having the victim see him.

¶ 24. The facts of this case contrast sharply with State v. Persuitti, 133 Vt. 354, 339 A.2d 750 (1975), in which this Court held that there was enough evidence of intent to survive a motion for acquittal for aggravated assault. In that case, the defendant and two accomplices planned a burglary, agreeing "to use whatever force was necessary to subdue [the victim]" and carrying loaded handguns, a length of pipe, masks, tape, gloves, and a flashlight. Id. at 356, 339 A.2d at 751. The defendant remained just outside while one accomplice entered the home and severely beat the victim. On appeal, the defendant claimed that there was insufficient evidence to demonstrate that he had the requisite specific intent for aggravated assault because "the force used went beyond his contemplation." Id. at 356, 339 A.2d at 752. This Court rejected the argument, explaining that the defendant had the requisite intent based on the plan created in advance and the heavily armed nature of the expedition. Id. at 357, 339 A.2d at 752. The uncontested facts in this

---

[2] The majority asserts that defendant's decision not to wear a mask indicates that he had intended to kill the victim if she saw him. Assuming this is a reasonable inference that could be drawn from the evidence, the mask-wearing on its own is not enough to demonstrate an intent to kill or inflict serious injury.

case differ in several key ways—here, the plan was not to harm the victim, the guns were not loaded and there were no other weapons used, and no items were brought to tie up or restrain the victim.

¶ 25. The majority infers that defendant acted with a wanton disregard for the victim's life and knew that his conduct would cause death or great bodily harm foremost from the fact that defendant and his codefendants brought guns into the house for the robbery. Ante, ¶ 14. The majority relies on State v. Parker, 139 Vt. 179, 423 A.2d 851 (1980), for the proposition that a gun, regardless of whether it is loaded, is a dangerous weapon and from that infers that defendant acted with a murderous intent.

¶ 26. The majority's reliance on Parker is misplaced. Parker held that use of a gun, loaded or unloaded, supported an assault charge because it demonstrated intimidation of the victim, but Parker did not hold that the defendant's intent to harm could be inferred from use of an unloaded gun. In Parker, the defendant was convicted of assault and robbery with a dangerous weapon based on the evidence that the defendant pointed a gun at a bank clerk, but made no threatening gestures, and the gun was unloaded. On appeal, the defendant argued that he was not armed with a dangerous weapon because the gun was unloaded, and therefore, use of an unloaded weapon showed he did not have intent to harm. This Court explained that this was not a specific intent crime and, as a result, the gun did not have relevance to intent. It concluded, however, that the gun was a "dangerous weapon" because it carried with it an implied threat of injury. Id. at 183, 423 A.2d at 853. In other words, the gun's use was relevant to demonstrate the intimidation element of the assault, but not as circumstantial evidence of the defendant's intent. See State v. Longley, 2007 VT 101, ¶ 11, 182 Vt. 452, 939 A.2d 1028 (holding that State need not prove that firearm loaded or operable to be "deadly weapon" for aggravated domestic assault because crime focused on victim's objective perception of danger not existence of imminent threat).

13

¶ 27. Here, the majority seeks to use the unloaded guns for a different purpose: to show that defendant knew his conduct would cause death or great bodily injury. The majority claims that using a weapon, even if unloaded, creates the potential for serious injury or death because there is a chance the weapon will provoke retaliation or there is a chance a weapon actually will be loaded.[3] This is exactly the element-scope creep that prompts this dissent. In essence, the majority is reasoning that defendant had the same intent as the killer, even though the facts are that he could not have had that intent if, as the facts showed, he believed the gun was unloaded as the killer agreed it would be. The teaching of Bacon is that defendant cannot be held responsible for the " 'unforeseen and unagreed-to results of another felon.' " Bacon, 163 Vt. at 292, 658 A.2d at 63 (quoting People v. Aaron, 299 N.W.2d 304, 327 (Mich. 1980)).

¶ 28. With respect to the possible retaliation, the difference between evidence showing an intent to kill and that demonstrating a risk of danger in general is precisely what separates second-degree murder from criminally negligent conduct. To show the intent required for second-degree murder, "the defendant must subjectively be aware of the deadly risk to the victim." State v. Brunell, 159 Vt. 1, 7, 615 A.2d 127, 131 (1992). " '[T]he degree of risk of death or serious bodily injury must be more than a mere unreasonable risk, more even than a high degree of risk.' " Id. at 8, 615 A.2d at 131 (quoting 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.4, at 200 (1986)). The risks of harm asserted by the majority are simply not high enough to equate risk of harm with an intent to kill.

_____

[3] Certainly, where a deadly weapon is actually used in a crime, the jury may use this fact to infer malice. See State v. Haskins, 2016 VT 79, ¶ 42, __ Vt. __, 150 A.3d 202, cert. denied, __U.S. __, 137 S. Ct. 1375 (holding that "court did not err by charging the jury that it could, but was not required to, infer an intent to kill from the manner in which the deadly weapon was used"). In general, other states allow the jury to infer malice and intent "where the defendant has shot the victim with a firearm under circumstances not affording the defendant an excuse, justification or provocation." State ex rel. Corbin v. Haines, 624 S.E.2d 752, 758 (W. Va. 2005). The jury may not, however, infer malice from the use of a weapon unless "the defendant did in fact use a deadly weapon." Id. at 759 (quotation omitted). Here, although defendant was involved in the felony, he did not actually use a deadly weapon during the commission of the felony.

14

¶ 29.    I emphasize that the evidence must relate to the intent of defendant in particular.  It is not the wantonness of the perpetrators as a whole that is at issue in this appeal; instead, it is the intent of defendant, and it cannot be based on the " 'unforeseen and unagreed-to results of another felon,' " as Bacon holds.  163 Vt. at 292, 658 A.2d at 63 (quoting Aaron, 299 N.W.2d at 327).  The action of the killer was neither agreed-to nor foreseeable to defendant.

¶ 30.    The majority also infers wantonness from the evidence about what happened after defendant and his accomplices entered the home.  Our cases have not addressed the question of whether the intent to kill required for felony murder must be formed prior to the felony being committed.  Comparisons to felony-murder cases from other jurisdictions are not particularly useful because "felony murder varies substantially throughout the country."  2 W. LaFave, Substantive Criminal Law §14.5 (2d ed.) (explaining different ways that felony murder has been limited).[4]  Michigan is most similar to Vermont, requiring an intent of "at least reckless disregard of a probability of grievous injury" to support felony murder.  See G. Binder, Making the Best of Felony Murder, 91 B.U. L. Rev. 403, 440 (2011) (explaining that only Vermont and Michigan require both intent to commit underlying felony and intent to kill).  In Michigan, the intent to kill may be formulated even after the felony begins.  See People v. Carines, 597 N.W.2d 130, 137 (Mich. 1999) (explaining that even if defendant did not have intent prior to beginning of robbery, inference from facts related to killing could support finding that defendant formed intent after felony began or "at the very least became aware of his cohort's intent during the events in question"); People v. Kelly, 378 N.W.2d 365, 373 (Mich. 1985) (concluding that evidence

---

[4] In other jurisdictions, there is no additional intent element and therefore the mere fact of participation in a robbery, which resulted in a killing, would make an accomplice guilty of felony murder.  See United States v. Carter, 445 F.2d 669, 672 (D.C. Cir. 1973) (holding that defendant who participated in robbery, which resulted in killing, was guilty of first-degree murder even though accomplice did actual shooting).  This is true as long as the homicide has some causal connection with the felony; "the usual rule being that the death must be the foreseeable or natural result of the felony."  2 LaFave, supra, § 14.5.

15

supported that defendant either had intent prior to entering home, formed intent once inside house, or became aware of codefendant's intent at some point during proceeding).

¶ 31.    Even accepting that defendant's intent could be formed after the felony began and defendant entered the home, there is no evidence to indicate that defendant formulated this intent once inside the house or even that he became aware of his codefendant's intent at some point.  The majority relies on the fact that once inside the home defendant saw that his codefendant had the victim on her knees with the gun to her head.  The majority asserts that this was a life-threatening situation and at this point defendant "was or should have been aware of the peril facing the victim." Ante, ¶ 17.  The flaw in the logic is that there is no evidence to indicate that defendant knew the gun was loaded at that time.  Without this critical piece of knowledge, the situation that defendant saw would not have created a danger in his mind.

¶ 32.    Certainly, it would be appropriate for the jury to resolve any conflicting evidence regarding whether defendant agreed to use force or defendant knew the weapons were loaded, but here the uncontested evidence was that defendant agreed that no one was to be hurt and that loaded weapons were not to be used.  Given the uncontested facts that defendant agreed that the robbery would be committed when the victim was sleeping, that she would not be harmed, and that unloaded guns would be used, the State lacks evidence to reasonably show that defendant acted with intent to kill or cause severe injury.  Therefore, I believe the trial court properly dismissed the felony murder charge and dissent.

<br>

_____
Associate Justice

16